Donald HARRIS, Petitioner,

v.

Clarice STOVALL, Respondent,

No. CIV. 97–CV–76301–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 22, 1998.

James S. Lawrence, Detroit, MI, for Petitioner.

Theodore E Hughes, Lansing, MI, for Respondent.

### OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS [1]

TARNOW, District Judge.

Petitioner, Donald Harris ("petitioner"), presently confined at the Mound Correctional Facility in Detroit, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his application, filed pro se, petitioner challenges his conviction and sentence on one count of first degree felony murder, M.C.L. § 750.316; M.S.A. § 28.548. For the reasons stated below, petitioner's application for writ of habeas corpus is denied.

### I.  Background

On May 7, 1975, John Anthony was shot and killed in an armed robbery of his store in Detroit, Michigan. Petitioner was subsequently charged with first degree felony murder along with two co-defendants, Stanley West and Frederick Wilkes. The two co-defendants had a separate preliminary examination on May 21, 1975 before the Honor-

1. Staff Attorney Daniel H. Besser provided quali-  ty research assistance.

able Joseph E. Maher of the Detroit Recorder's Court, after which they were bound over for trial.[1] The two co-defendants were tried separately prior to petitioner and were convicted of first degree murder. Petitioner was then tried alone and also convicted of first degree murder. He received the mandatory sentence of life imprisonment without parole.

At petitioner's trial, the victim's daughter, Victoria Anthony, testified that she was working in her father's store, Anthony's Market, on the day of the robbery. While waiting on customers at the cash register in front of the store, she heard gunshots coming from the back of the store by the meat counter where her father had been working. The apparent shooter ran by the counter and shouted: "wait a minute bitch, don't move." He then ran out of the store, where he was joined on the street by another man who was also running from the vicinity of the store. One man had on a red hat while the other man had on a black hat. The two men were joined by two other men up the street.

Victoria Anthony viewed two separate police lineups, one containing petitioner in it. She was unable to identify anyone in either police lineup.

At petitioner's trial, Ms. Anthony admitted identifying one of the two co-defendants at the first trial as having been the shooter, but could not recall which of the two co-defendants she had identified as being in the store. She did acknowledge that she had picked out either co-defendant Wilkes or West as having been her father's assailant.

Cornelius Weaver, the victim's brother-in-law, was working in the store by the meat counter on the day of the shooting. Weaver began waiting on a man in the store who began asking questions and complaining about the price of bologna. Weaver referred this man to Mr. Anthony and walked over to the cash register. Shortly thereafter, Weaver heard gunshots coming from the back of the store. He then saw the man that he and the victim had both waited on running from

the back of the store and pointing a gun at him. This man then ran out the door and was observed by Weaver running down the street with another individual.

Weaver also viewed two police lineups. Although he identified someone at the first lineup, he was unable to identify anyone at petitioner's lineup. On cross-examination, Weaver admitted that he had identified someone at the Wilkes/West trial as having been the shooter, but did not state which of the two co-defendants he had identified. However, at Wilkes' and West's preliminary examination on May 21, 1975, Weaver had positively identified co-defendant Wilkes as the person who shot and killed Mr. Anthony.[2]

Lois Anthony, the wife of the victim, testified that, on the morning of the shooting, she had cleaned the glass covering of the meat case around 10:00 to 11:00 a.m. as was her customary practice.

James Kelley of the Latent Fingerprint Unit of the Detroit Police Department testified that a palmprint taken off of the meat counter in the victim's store contained sixty (60) points of comparison with petitioner's palm and fingerprints. Kelley testified that only nine (9) points of comparison were required by the Detroit police to make a positive identification of a palmprint and only twelve (12) points of comparison were required by the Michigan state police.

Officer Leo Haidys, the detective in charge of the case, acknowledged that no one positively identified petitioner at his police lineup.

Frankie Stewart, a/k/a Pierre, testified that co-defendant West, a/k/a "Big Rick", brought petitioner over to his house on the day of the murder, where the three men planned a robbery. West told Stewart that petitioner had a gun. They were later joined by co-defendant Wilkes, a/k/a "Roscoe". Petitioner was wearing a red skull cap and blue jacket and West was wearing a black hat and jacket.

**1.** Preliminary Examination Transcript; May 21, 1975, filed with the Detroit Recorder's Court on June 30, 1975.

**2.** Preliminary Examination Transcript, May 21, 1975, pp. 10–11, 13.

The four men began searching for stores to rob. Petitioner and West discussed robbing a Kingsway Store but decided against it after petitioner went into the store and saw that the store had a security guard and was too crowded.

The men ended up at Anthony's Market at Stewart's suggestion. Petitioner did a preliminary check of the store, but initially decided against committing a robbery because the store was too crowded. West went into the store and bought some candy. After waiting awhile outside the store, Petitioner stated: "This is cool, I'm going to get down" and went into the store followed by West. Stewart by then had decided not to participate in the robbery. He and Wilkes began to walk away from the store. He heard gunshots and saw West run out of the store followed by petitioner. The four men all ran from the store and ended up at Stewart's house. At the house, petitioner admitted shooting the victim, claiming it was "either him or me." Frankie Stewart admitted that he was not charged with any crimes arising out of his participation in this offense.

Marlene Stewart, Frankie Stewart's wife, and Gerald Rucker, Marlene's nephew, both testified that they were present at Frankie Stewart's home and heard petitioner confess to shooting the victim. Both witnesses indicated that Frankie Stewart and the two co-defendants, however, had been involved in either the planning or commission of this offense, although they appeared angry that the victim had been shot. Rucker admitted that he had been unable to positively identify petitioner at petitioner's preliminary examination several months earlier.

Marcia Robinson, Marlene Stewart's sister, was also present on the night in question and also heard petitioner confess the murder to his accomplices. Petitioner was wearing a red hat and leather coat that night. Robinson admitted that she was Wilkes' girlfriend and was aware that he had earlier been convicted of first degree murder for this shooting. Ms. Robinson attended Wilkes' trial and acknowledged that Wilkes had been positively identified as the shooter at his trial.

In closing argument, petitioner's trial counsel, Cornelius Pitts, argued that petitioner had not been identified by anyone in the courtroom as having been the shooter. He also pointed out that co-defendant Wilkes had been positively identified at the prior trial as being the shooter by the eyewitnesses.

Petitioner was found guilty of one count of first degree murder and was sentenced to life imprisonment on March 12, 1976.

Petitioner appealed his conviction to the Michigan Court of Appeals, which granted Respondent's Motion to Affirm on February 2, 1978.[3] The Michigan Supreme Court denied petitioner leave to appeal on February 7, 1979.[4] Petitioner subsequently brought a motion for a new trial which was denied by the trial court. His appeal to the Michigan Court of Appeals from the denial of this motion was denied on July 2, 1981.[5] The Michigan Supreme Court denied leave to appeal on May 24, 1982.[6]

A petition for writ of habeas corpus filed in the Western District of Michigan by petitioner was dismissed without prejudice by Judge Benjamin Gibson for failure to exhaust state remedies[7]

Petitioner then filed a motion for relief from judgment in the Detroit Recorder's Court. This was denied on January 23, 1992.[8] The Michigan Court of Appeals denied leave to appeal on July 24, 1992[9] and the Michigan Supreme Court subsequently denied leave to appeal[10]

3. Michigan Court of Appeals, Docket # 28995.

4. Michigan Supreme Court Order, dated February 7, 1979.

5. Michigan Court of Appeals, Docket # 45605.

6. Michigan Supreme Court, Docket # 67708.

7. United States District Court, Docket # G89–30026–CA.

8. Order of the Detroit Recorder's Court, dated January 23, 1992.

9. Michigan Court of Appeals Docket # 149650.

10. *People v. Harris*, 442 Mich. 876, 500 N.W.2d 474 (1993).

Petitioner raises one substantive claim and two procedural claims in his petition for a writ of habeas corpus:

I. WAS PETITIONER DENIED DUE PROCESS OF LAW WHERE THE TRIAL COURT DENIED DEFENSE COUNSEL'S REQUEST FOR PRODUCTION OF THE TRIAL TRANSCRIPT OF THE CO-DEFENDANTS' EARLIER TRIAL?

II. SHOULD THE ONE YEAR TIME LIMIT ON THE FILING OF HABEAS PETITIONS, ENACTED BY CONGRESS IN 1996, BE APPLIED RETROACTIVELY TO BAR PETITIONER FROM FILING THIS PETITION, WHERE IT WAS FILED WITHIN ONE YEAR OF THE STATUTE'S ENACTMENT?

III. SHOULD PETITIONER'S PREVIOUSLY FILED PETITION FOR WRIT OF HABEAS CORPUS BAR THIS PETITION FOR WRIT OF HABEAS CORPUS, WHERE THE EARLIER PETITION WAS DISMISSED FOR FAILURE TO EXHAUST STATE REMEDIES?

Because respondent has not contested this Court's jurisdiction over this case, this Court will dispose of the last two procedural issues in its discussion of the main substantive issue raised by petitioner.

## II. Standard of Review

Review of a state court's decision under 28 U.S.C. § 2254 is governed by the standards established by the Antiterrorism and Effective Death Penalty Act, Pub.L. No. 104–132, 110 Stat. 1214 (Apr. 26, 1996). The Act altered the standard of review that a federal court must use for writs of habeas corpus. As amended, 28 U.S.C. § 2254(d) provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in

State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

■ The first question that a federal court must ask is whether the state court's resolution of any legal questions underlying its decision on the claim was contrary to clearly established federal law, *Drinkard v. Johnson*, 97 F.3d 751 (5th Cir.1996); *cert. den.* —— U.S. ——, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997). The "unreasonable application" standard of review must mean more than that a federal court may grant habeas relief based upon its simple disagreement with the state court's decision. The use of the word 'unreasonable' in this restrictive standard of review implies that federal courts must "respect all reasonable decisions of state courts." *Drinkard, supra* at 768.

■ A federal court must apply the presumption of correctness to state court findings of fact for habeas corpus purposes unless convincing evidence is offered to rebut this presumption. *West v. Seabold*, 73 F.3d 81, 83 (6th Cir.1996); *cert. den.* 518 U.S. 1027, 116 S.Ct. 2569, 135 L.Ed.2d 1086 (1996). 28 U.S.C. § 2254(e)(1).

To implement this new standard of review, the United States Court of Appeals for the Sixth Circuit chose to follow an approach employed by the United States Court of Appeals for the First Circuit in *Martin v. Bissonette*, No. 96–1856, 1997 WL 280602, *9 (1st Cir. May 29, 1997), withdrawn and new opinion issued, 118 F.3d 871 (1997). *Harpster v. Ohio*, 128 F.3d 322, 326–27 (6th Cir. 1997).[11] First, the reviewing court should

---

**11.** It should be noted that the First Circuit withdrew its initial opinion because the Supreme Court subsequently held that the AEDPA was not to be applied retroactively. *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 2067–68, 138

L.Ed.2d 481 (1997). The petition in *Martin* had been filed prior to the effective date of the AEDPA and therefore was not subject to its provisions. Despite the fact that the First Circuit withdrew its analysis of the applicable standard

determine whether the Supreme Court has established a precedent which clearly compels an outcome for the issue at hand. Then, if no such Supreme Court precedent exists, the court should determine whether the state court decision involved an unreasonable application of federal law as established by the Supreme Court. *Harpster*, 128 F.3d at 327.[12]

Under the standard outlined in *Harpster*, the initial question is whether a Supreme Court precedent determines the outcome for the issues raised in the petition for writ of habeas corpus. If there is no Supreme Court precedent controlling those issues, then this Court must determine whether the state court decision on those issues constituted an unreasonable application of federal law as established by the Supreme Court.

### III. Discussion

**A. Claim 1.** Petitioner claims that the trial court's refusal to provide him with a copy of his co-defendants' trial transcript violated his due process rights and entitles him to habeas relief from this Court.

Petitioner first raised this issue in his motion for relief from judgment, which was denied by the trial court. The Michigan Court of Appeals refused to grant leave to appeal, ruling that petitioner's application lacked merit. The Michigan Supreme Court ultimately ruled that petitioner had failed to establish entitlement to relief under MCR 6.508(D).

As a preliminary matter, this Court notes that it has jurisdiction to hear this case. Although petitioner's last state action occurred in 1993, petitioner filed this petition for a writ of habeas corpus on February 12, 1997, which was within one year of April 24, 1996, the date that the new one year statute of limitations governing habeas petitions became effective. 28 U.S.C. § 2244(d). A petitioner whose state court proceedings were completed prior to this date generally has one year from the effective date of the AEDPA to file his or her petition for writ of habeas corpus with the federal court. *Lindh v. Murphy*, 96 F.3d 856, 866 (7th Cir.1996); *Calderon v. U.S. District Court for Central District of California*, 128 F.3d 1283, 1287 (9th Cir.1997); *cert. den.* —— U.S. ——, 118 S.Ct. 899, 139 L.Ed.2d 884 (1998); *Moore v. Hawley*, 7 F.Supp.2d 901 (E.D.Mich.1998). Petitioner has brought this action within one year of the effective date of the AEDPA and has therefore filed his petition within the one year statute of limitations.

■ Although petitioner has previously filed a petition for writ of habeas corpus with the Western District of Michigan, which was dismissed on the grounds that petitioner had failed to exhaust his state remedies prior to coming to federal court, petitioner need not obtain permission from the Sixth Circuit Court of Appeals to file this petition with this Court. 28 U.S.C. § 2244 requires a petitioner who wishes to file a "second or successive" petition for writ of habeas corpus to first obtain leave from the circuit court to do so. However, a habeas petition filed after a previous petition was dismissed on exhaustion grounds is not a "second or successive" petition within the meaning of the AEDPA. It is therefore not necessary for petitioner to obtain a certificate of authorization from the Sixth Circuit. *Carlson v. Pitcher*, 137 F.3d 416 (6th Cir.1998); *see also Camarano v. Irvin*, 98 F.3d 44 (2nd Cir.1996). This Court therefore has jurisdiction to bear this case.[13]

---

of review under the AEDPA, the Sixth Circuit has elected to follow the reasoning of that withdrawn decision.

**12.** The court compared this approach to that of the Courts of Appeals for the Fifth and Seventh Circuits as outlined in *Drinkard v. Johnson*, 97 F.3d 751, 767–68 (5th Cir.1996) and *Lindh v. Murphy*, 96 F.3d 856, 870 (7th Cir.1996), *rev'd on other grounds*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Under that approach, the reviewing court first determines whether the issue at hand is one of law, fact, or a mixed question of law and fact. If the issue is one of fact, § 2254(d)(2) applies. If one of law, the "contrary to" language of § 2254(d)(1) applies, and if one of mixed law and fact, the "unreasonable application" language of § 2254(d)(1) applies. Although the Court of Appeals for the Sixth Circuit chose to adopt the First Circuit approach, the court noted that the two approaches would likely lead to the same result. *Harpster*, 128 F.3d at 327.

**13.** Respondent does not suggest that this Court lacks jurisdiction to hear this case in its Answer.

■ For purposes of determining whether federal habeas relief must be granted to a state prisoner on the ground of a federal constitutional error, the appropriate harmless error standard to apply is whether the error had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

In this case, petitioner claims that the co-defendants' trial transcript would have assisted his defense because both Victoria Anthony and Cornelius Weaver identified co-defendant Wilkes as being the shooter at his trial, whereas at petitioner's trial they were only able to testify that they had identified one of the two other co-defendants as the assailant at the prior trial. Petitioner contends that it was crucial to have the jury know that it was Wilkes specifically who had been identified as the shooter at the prior trial, because this would have damaged the credibility of witness Frankie Stewart, who had testified that Wilkes had remained outside of the store with him and had not participated in the robbery.

■ As a matter of equal protection, a state must provide indigent defendants with the basic tools for an adequate defense or appeal, when those tools are available at a price to other defendants. The state must therefore provide an indigent defendant with a transcript of the prior proceedings when that transcript is needed for an effective appeal or defense. *Britt v. North Carolina*, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971). The state must also provide a copy of a preliminary examination transcript to an indigent defendant. *Roberts v. La Vallee*, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967).

■ In determining the need of an indigent defendant for a free transcript of a prior proceeding in a criminal case, the two relevant factors are:

1. the value of the transcript to the defendant in connection with the appeal or trial for which it is requested, and
2. the availability of alternative devices that would fulfill the same functions as the transcript.

*Britt v. North Carolina, supra* at 227–228, 92 S.Ct. 431.

The Supreme Court suggested that, even in the absence of specific allegations, it could ordinarily be assumed that a transcript of a prior proceeding such as a prior mistrial would be valuable to a defendant as both a discovery device in preparation for trial, and as a tool in itself for the impeachment of witnesses. *Britt v. North Carolina, supra* at 227–228, 92 S.Ct. 431.

Where there has been no showing of the availability of alternative devices to take the place of the transcript from the prior proceeding, the failure of the trial court to provide an indigent defendant with the transcript from the prior proceeding has been held to be reversible error. *Riggins v. Rees*, 74 F.3d 732 (6th Cir.1996); *Martin v. Rose*, 525 F.2d 111 (6th Cir.1975). Michigan courts have also held that the failure to provide a transcript of a first trial that ended in mistrial to a defendant being retried on that charge was reversible error. *People v. Glass*, 38 Mich.App. 735, 197 N.W.2d 140 (1972). *See also People v. Hughes*, 411 Mich. 517, 309 N.W.2d 525 (1981), where the Michigan Supreme Court, in reversing a first degree murder conviction, ordered that the indigent defendant be provided with a copy of the transcript from his first trial which ended in a mistrial.

■ Respondent urges this Court to deny the petition for writ of habeas corpus on the ground that the above cases all involve the trial court's refusal to provide a defendant with the transcripts from his or her prior trial or hearing. This Court does not read the holdings of these cases so narrowly so as to preclude a defendant in a criminal trial from gaining access to the trial transcripts of other defendants, if those transcripts are necessary for discovery or impeachment purposes and there is no available alternative to fulfill those functions. Accordingly, this Court would find that the holding in *Britt v. North Carolina, supra*, would entitle an indigent defendant to the production of a trial transcript from another defendant's trial, if such a transcript were necessary for discovery or impeachment purposes and there were

no available alternatives to fulfill those functions.

■ However, in this case, this Court concludes that alternatives to transcripts from West's and Wilkes' trial were readily available to petitioner and the trial court's failure to provide petitioner with the trial transcripts was not a violation of his constitutional rights. A transcript from West's and Wilkes' preliminary examination was filed with the Detroit Recorder's Court on June 30, 1975 and was a part of the court file. At this preliminary examination, Cornelius Weaver positively identified Wilkes as being the shooter. Petitioner's counsel could have impeached Weaver at petitioner's trial with his testimony from the preliminary examination. In addition, petitioner's counsel was able to get both Ms. Anthony and Mr. Weaver to admit at petitioner's trial that they had identified one of the two co-defendants at the earlier trial as having been the shooter. Both witnesses also acknowledged that neither had ever identified petitioner in connection with this offense. Counsel was also able to get Marcia Robinson, Wilkes' own girlfriend, to acknowledge that Wilkes had positively been identified as the shooter at his trial by the witnesses. Counsel, in fact, argued to the jury in his closing argument that petitioner had never been positively identified as the shooter, but that co-defendant Wilkes had been so identified by the witnesses. Petitioner therefore had adequate alternatives to the transcripts of the prior trial that he used both for discovery and impeachment purposes.

■ Additionally, this Court concludes that the failure of the trial court to provide petitioner with the trial transcripts of the co-defendants was harmless error in light of the evidence in this case and the state of the law in Michigan at the time concerning the felony-murder doctrine.

In the present case, a number of witnesses testified that they heard petitioner admit that he was the shooter. Although these witnesses were all either related to or friends of either Frankie Stewart, an accomplice who was never charged with this offense, or Frederick Wilkes, who was charged and convicted of this crime, their testimony was consistent.

Their testimony was further bolstered by the presence of petitioner's palmprint on the meat counter in the store, where the shooting took place. Although Victoria Anthony could not identify petitioner as being in the store at the time of the shooting, she did testify that one of the two men running away from the store was wearing a red hat. Both Frankie Stewart and Marcia Robinson indicated that petitioner had been wearing a red hat on the day in question. The testimony of the witnesses, combined with the physical evidence, conclusively established that petitioner was at least actively involved in the robbery, if not the actual shooter.

At the time of the commission of this offense, Michigan still followed the old common law felony-murder rule. Michigan's first degree murder statute, M.C.L.A. § 750.316; M.S.A. § 28.548, as enacted at the time of this offense, indicated that a murder which was committed during the course of certain enumerated felonies, including robbery, was first degree murder. Under the felony-murder doctrine in place at the time of petitioner's trial, all parties to an agreement to commit one of the felonies enumerated in the murder statute were liable for a murder committed in furtherance of that planned felony, even though a homicide was not planned. *People v. Smith,* 33 Mich.App. 336, 189 N.W.2d 833 (1971); *See also People v. Goree,* 30 Mich.App. 490, 186 N.W.2d 872 (1971).

In *People v. Aaron,* 409 Mich. 672, 299 N.W.2d 304 (1980), the Michigan Supreme Court abolished the felony-murder doctrine, holding that the intent to commit a felony does not equal the requisite malice aforethought element of murder. The Supreme Court ruled that, to obtain a conviction for first degree felony murder, the state would now have to show, in addition to the commission of the felony, that the defendant had acted with malice aforethought, i.e., an intent to kill, an intent to do great bodily harm, or a wanton and wilful disregard that the natural tendency of one's behavior is to cause death or great bodily harm. *People v. Aaron, supra.*

The decision in *People v. Aaron, supra,* however, was not applied retroactively. The

holding only applied prospectively to any trials in progress or future trials occurring after the November 24, 1980 decision of the Court. *People v. Aaron, supra* at 734, 299 N.W.2d 304; *Bowen v. Foltz,* 763 F.2d 191, 192 (6th Cir.1985); *People v. Smith,* 108 Mich.App. 338, 342, 310 N.W.2d 235 (1981).

Petitioner does not contest his involvement in the robbery, but denies being the shooter. Under the old felony-murder rule in effect at the time of petitioner's trial, petitioner's involvement in this robbery renders him liable for this murder. *People v. Smith, supra.*

Moreover, a retroactive application of the *Aaron* case and its progeny would not relieve petitioner from culpability for this murder even if he were not the shooter. Although the Michigan Supreme Court abolished the common-law felony murder doctrine in that case, the Supreme Court did indicate that a jury could properly infer the intent to kill from evidence that a defendant intentionally set into motion a force likely to cause death or great bodily harm. The Court went on to say that whenever a killing occurs in the perpetration of an inherently dangerous felony, the jury may consider the nature of the underlying felony and the circumstances surrounding its commission in order to find malice. *People v. Aaron, supra* at 729, 299 N.W.2d 304.

In *People v. Hart,* 161 Mich.App. 630, 411 N.W.2d 803 (1987); *aft remand*170 Mich.App. 111, 427 N.W.2d 557 (1988), the Michigan Court of Appeals affirmed a defendant's conviction as an aider and abettor to first degree murder, where the underlying felony was armed robbery. The Court of Appeals found that the defendant's involvement in a robbery, where a gun was involved, showed wanton and wilful disregard of the likelihood that the natural tendency of his behavior would cause death or serious bodily injury: "The very essence of armed robbery is the procurement of another's property through threat of death or bodily injury." *People v. Hart, supra* at 635, 411 N.W.2d 803. The Court of Appeals ruled that the jury could properly infer malice in this situation.

Similarly, petitioner's participation in an armed robbery, involving a loaded firearm, manifested a wanton and reckless disregard that death or serious bodily injury could occur, as it did here. Petitioner could therefore be found guilty of this crime regardless of whether he actually shot the victim or merely participated in the robbery in another capacity.

To summarize, petitioner's only substantive habeas claim must fail where adequate alternatives to his co-defendants' trial transcript existed and where some were in fact utilized as both discovery and impeachment devices by counsel. In addition, because the evidence strongly implicated petitioner in the planning and commission of this robbery, as well as in the actual shooting, any error in failing to provide these transcripts was harmless.

### IV. ORDER

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DENIED.**