**Donald Ray HARPSTER,**
**Petitioner–Appellee,**

v.

**STATE OF OHIO, Respondent–Appellant.**

No. 96–3962.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 7, 1997.

Decided Sept. 18, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied Nov. 4, 1997.

Kirk A. Migdal (argued and briefed), Akron, OH, for Petitioner–Appellee.

Philip D. Bogdanoff, Asst. Prosecuting Atty. (argued and briefed), Office of the Prosecuting Attorney, Akron, OH, for Respondent–Appellant.

Before: LIVELY, KENNEDY, and NORRIS, Circuit Judges.

KENNEDY, Circuit Judge.

Respondent-appellant, State of Ohio, appeals the District Court's order granting habeas corpus relief to petitioner-appellee, Donald Ray Harpster, under 28 U.S.C. § 2254. The District Court found that the state court in petitioner's criminal trial declared a mistrial over defense objection without manifest necessity, thereby barring retrial of petitioner on double jeopardy grounds. For the following reasons, we AFFIRM.

## I. Facts

### A. Background

In the summer of 1995, petitioner lived with his girlfriend and her three year old daughter. On August 31, 1995, the girlfriend's daughter told her mother that petitioner had touched her private parts. The girlfriend and her daughter moved out of petitioner's house and went to the Children's Hospital Care Center, where the daughter repeated her allegations to a pediatric nurse-practitioner. On September 13, 1995, Akron Police Detective Edward Mathews asked petitioner to accompany him to the police station to make a statement regarding the alleged sexual abuse. After an interview lasting from thirty to forty-five minutes, petitioner denied sexually abusing his girlfriend's daughter and returned home. The investigation continued. On October 2 and again on October 10, 1995, Akron Police

detectives gave petitioner polygraph examinations. The results of these examinations indicated deceptiveness, but petitioner still denied the allegations and returned home after each one. Detective Mathews questioned petitioner a fourth time on the morning of October 25, 1995. During this interrogation, Detective Mathews had petitioner read Ohio Revised Criminal Code § 2907.12, which stated that a person convicted of felonious sexual penetration "shall be sentenced to life." During the same interrogation, Mathews suggested to petitioner, but did not promise or guarantee, that there was a possibility that he could receive remedial counseling instead of a life sentence if he confessed. Petitioner then confessed, and was arrested and charged with felonious sexual penetration.

## B. State Court Proceedings

The state criminal trial began on April 15, 1996. During a pre-trial hearing, petitioner moved to suppress his confession as involuntary. Respondent moved to exclude the details of the penalty that attaches to felonious sexual penetration, namely, a mandatory life sentence. The trial court allowed petitioner's confession into evidence. It also issued the following ambiguously worded order:

> .... My ruling is that the evidence does not come in. You may have the testimony that he was shown the penalty from the statute and specify what the penalty is short of stating the penalty.
>
> You may have him testify that he was presented with the information so that you may argue whatever you wish to argue from the fact that the Defendant recognized that a certain penalty could be imposed in the particular case.

Joint Appendix at 160. Although the specific boundaries of the order were not clear, both parties and the court agreed that petitioner would not be allowed to introduce evidence that he faced a life sentence.

During opening statements, defense counsel described petitioner's fear of the penalties for felonious sexual penetration. He stated that petitioner confessed only "after hearing and knowing the terrible penalties involved." Joint Appendix at 164. Defense counsel then continued with the statement that petitioner had

> realized that at that point if he didn't admit to something he didn't do, he could be punished and imprisoned and all of the things started going through his head, the fact of what happens in prison, that a little guy is likely—is going to get raped and beaten and he was scared.

*Id.* at 165. At this point, respondent objected to defense counsel's statements. The court summarily overruled the objection. Defense counsel continued to describe petitioner's fear of punishment, stating that he was concerned "that he wasn't going to see his family again, most importantly ... that he wasn't going to see his son Nathan again." *Id.*

Then the state began its case. When defense counsel cross-examined the prosecution's fourth witness, Detective Mathews, the following exchange took place:

Q: And you wanted him to know what the penalty was because you knew how bad the penalty was?

A: Penalty is stiff.

. . . .

Q: You wanted to scare him or let him know the penalty, that's why you told him to read the penalty?

A: Let him know the penalty section of it, that's correct.

. . . .

Q: Why didn't you tell him—why didn't you just tell him, "It's a tough penalty, Don"?

A: It's more—it means more to them if they read it out loud.

Q: And it said "shall receive the penalty," didn't it?

A: Yes, it did.

Q: And you knew that that meant no probation, it meant "shall receive the penalty"?

Joint Appendix at 140–41. The prosecution then moved for a mistrial. Defense counsel objected. The court took the motion under consideration for fifteen minutes, returned to hear arguments from both parties, and then granted a mistrial over defense objections.

As it declared a mistrial, the court explained to defense counsel that its original command that petitioner "may have the testimony that he was shown the penalty from the statute and specify what the penalty is short of stating the penalty," actually meant

> that no penalty was to be discussed directly or indirectly before the jury; that you were to be permitted to set the facts and circumstances of the confession so the jury would weigh the credibility to be given to that evidence, nothing was to be said to the mandatory sentencing, the type of sentence, anything on the subject.

Joint Appendix at 194. Finding that petitioner violated its order and irreparably prejudiced the jury, the court declared a mistrial.

A second trial was scheduled for July 29, 1996. On July 19, petitioner moved to dismiss the charge based on a violation of the Double Jeopardy Clause. After hearing arguments from the parties on July 26, the court denied petitioner's motion and expressed additional reasons why it had ordered the mistrial in April. The court then explained to petitioner that the problem at trial actually had been "the cumulative effect of a number of statements made throughout your opening argument leading up to the final question asked of Detective Mathews, which was clearly in violation of the court's instruction." Joint Appendix at 269. The court also stated that it had crafted the original order to allow some description of the conditions surrounding the confession. It concluded that the final question caused incurable prejudice because learning that probation would not be an option would force the jury to conclude that petitioner's fears of jail would necessarily come true upon conviction. The court also stated that it had been "very much mindful of the possibilities of a double jeopardy having attached here." *Id.* at 271. The judge finished her justification of the mistrial by stating, "I was particularly motivated by your inflammatory statements regarding rape and assault in prison, and that is the reason that I felt a curative instruction would be of no consequence … so this was a carefully considered decision." *Id.* at 272. Because Ohio does not allow an appeal from an order denying a motion to dismiss, petitioner sought a stay of proceedings and habeas corpus relief from the United States District Court for the Northern District of Ohio.

### C. Federal Habeas Proceedings

The District Court initially stayed the state court proceedings and then granted petitioner's request for a writ of habeas corpus. The District Court based its ruling on three grounds. First it found that the trial court's enforcement of the order excluding evidence of the life sentence violated petitioner's rights under the Due Process Clause of the United States Constitution. Second, it found that petitioner's counsel had not violated the trial court's pre-trial order. Third, the court found that no manifest necessity justified a mistrial and an instruction to the jury would have cured any prejudice. Respondent appeals from the District Court's provision of habeas corpus relief.

### II. Discussion

#### A. Propriety of Review

 Respondent argues that the District Court should not have stayed the state court proceedings against petitioner to allow the litigation of his double jeopardy claim before his second trial. Because petitioner is entitled to have his double jeopardy claim litigated before being retried, we reject respondent's arguments. The Fifth Amendment's Double Jeopardy Clause protects individuals "not against being twice punished, but against being twice put into jeopardy." *Ball v. United States,* 163 U.S. 662, 669, 16 S.Ct. 1192, 1194, 41 L.Ed. 300 (1896). Therefore, "if a criminal defendant is to avoid *exposure* to double jeopardy and thereby enjoy the full protection of the Clause, his double jeopardy challenge … must be reviewable before the subsequent exposure occurs." *Abney v. United States,* 431 U.S. 651, 662, 97 S.Ct. 2034, 2041, 52 L.Ed.2d 651 (1977). As this court has explained, the federal adjudication of double jeopardy claims raised on pre-trial petitions for habeas corpus is appropriate when those claims have been raised and rejected in the state trial court and under state law there is no right to interlocutory appeal. *See Gully v. Kunz-*

*man*, 592 F.2d 283, 287 (6th Cir.1979), *cert. denied*, 442 U.S. 924, 99 S.Ct. 2850, 61 L.Ed.2d 292, *reh'g denied*, 444 U.S. 889, 100 S.Ct. 192, 62 L.Ed.2d 125. Petitioner satisfies these requirements. First, the trial court considered and rejected petitioners pre-trial motion to dismiss the second trial based on a violation of the Double Jeopardy Clause. Second, under Ohio law, "the overruling of a motion to dismiss on the ground of double jeopardy is *not* a final appealable order." *State v. Crago*, 53 Ohio St.3d 243, 244, 559 N.E.2d 1353 (1990). Under these circumstances federal adjudication was necessary to protect petitioner's rights under the Double Jeopardy Clause.

### B. Standard of Review

■ This court reviews the District Court's grant of habeas corpus relief *de novo*. *See, e.g., West v. Seabold*, 73 F.3d 81, 84 (6th Cir.1996), *cert. denied*, — U.S. —, 116 S.Ct. 2569, 135 L.Ed.2d 1086. Our review of the state trial court's decisions, however, is governed by the standards established by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996) ("AEDPA"). Chapter 153 of the AEDPA, signed into law on April 24, 1996, amended Title 28 of the United States Code and altered the standard of review that a federal court must employ when deciding whether to grant a writ of habeas corpus. As amended, 28 U.S.C. § 2254(d) (1997) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* Because petitioner filed his application for a writ of habeas corpus on July 26, 1996, after the effective date of AEDPA, the revised § 2254(d) governs our inquiry into whether habeas corpus relief was appropriate in this case. *See Lindh v. Murphy*, — U.S. —, —, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997) ("We hold that . . . the new provisions of chapter 153 generally apply only to cases filed after the Act became effective.").

The Sixth Circuit has not yet explained how courts should implement these new standards of review. The circuits that have construed the revised § 2254(d) have developed two slightly different approaches to review. Under the approach adopted by the Fifth and Seventh Circuits, a federal court first decides whether the petitioner challenges a question of law, a question of fact, or a mixed question of law and fact. *See Drinkard v. Johnson*, 97 F.3d 751, 767–68 (5th Cir.1996); *Lindh v. Murphy*, 96 F.3d 856, 870 (7th Cir.1996), *rev'd on other grounds, Lindh v. Murphy*, — U.S. —, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The categorization of the disputed issue determines which part of § 2254(d) applies. For instance, if the dispute involves a factual question, § 2254(d)(2) governs, and a federal court can grant a writ of habeas corpus only if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* Section 2254(d)(1) governs the two remaining types of questions. If a petitioner disputes the decision of a question purely of law, then the first clause of the § 2254(d)(1) governs and "a federal court may grant habeas relief only if it determines that a state court's decision rested on a legal determination that was 'contrary to . . . clearly established Federal law, as determined by the Supreme Court.'" *Drinkard*, 97 F.3d at 768 (quoting § 2254(d)(1)). If, however, a federal court reviews a mixed question of law and fact, then the second clause of § 2254(d)(1) applies, and it should not grant habeas relief unless the state court's decision amounted to "an unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). *See Drinkard*, 97 F.3d at 767–68; *Lindh*, 96 F.3d at 870.

In contrast, the First Circuit adopted an approach that avoids the classification of the issue into questions of law, questions of fact, or mixed questions of law and fact. Because an earlier draft of the AEDPA adopted this taxonomic approach, but the final version did not, the First Circuit decided that "it would be unseemly for a court to graft the discarded taxonomy onto the version of the bill that Congress subsequently enacted." *Martin v. Bissonette,* No. 96–1856, 1997 WL 280602, *9 (1st Cir. May 29, 1997), *withdrawn and new opinion issued,* 118 F.3d 871; *see also id.* at *9 n. 9 (comparing initial draft and final version of AEDPA). The approach adopted by the First Circuit proceeds as follows. Guided by the "contrary to" clause of § 2254(d)(1), the court first determines whether clearly established Supreme Court precedent provides a rule that compels an outcome to the issue at hand. If Supreme Court precedent provides no such rule, the court then determines whether the state court decision "involved an unreasonable application" of Federal law as established by the Supreme Court. *See id.* at *10. Under the First Circuit approach, therefore, courts need not classify disputed decisions into either questions of law or mixed questions of law and fact. The First Circuit approach, although different than the one adopted by the Fifth and Seventh Circuits, probably will not lead to different results. As the First Circuit remarked, "pure questions of law will often · be controlled by existing Supreme Court precedent, while mixed questions of law and fact will require a court to extrapolate from available caselaw." *Id.*

The difference between · the two approaches has no practical significance in this case, which presents the question of whether there was manifest necessity for the state trial judge to declare a mistrial. The question of manifest necessity is heavily fact intensive—a mixed question of law and fact— and the Supreme Court has specifically · avoided prescribing rigid rules that compel outcomes. *See, e.g., United States v. Jorn,* 400 U.S. 470, 480, 91 S.Ct. 547, 554–55, 27 L.Ed.2d 543 (1971). Therefore, under either approach we must decide whether the state court grant of a mistrial "involved an unrea-

sonable application of[ ] clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

## C. Double Jeopardy and the Manifest Necessity Doctrine

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, commands that no person shall "be subjected for the same offense to be twice put in jeopardy of life or limb," U.S. Const. amend. V, and applies to state prosecutions through the Fourteenth Amendment. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). The Double Jeopardy Clause serves a number of purposes. It precludes the State from making " 'repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity.' " *United States v. Dinitz,* 424 U.S. 600, 606, 96 S.Ct. 1075, 1079, 47 L.Ed.2d 267 (1976) (quoting *Green v. United States,* 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957)). It protects defendants in cases "in which a judge exercises his authority to help the prosecution, at a trial in which its case is going badly, by affording it another, more favorable opportunity to convict the accused." *Gori v. United States,* 367 U.S. 364, 369, 81 S.Ct. 1523, 1526–27, 6 L.Ed.2d 901 (1961). It also protects the defendant's "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949); *accord Arizona v. Washington,* 434 U.S. 497, 503–04, 98 S.Ct. 824, 829–30, 54 L.Ed.2d 717 (1978); *Dinitz,* 424 U.S. at 606, 96 S.Ct. at 1079; *Jorn,* 400 U.S. at 484–85, 91 S.Ct. at 556–57.

Nevertheless, the Double Jeopardy Clause allows retrial after the declaration of a mistrial when the defendant's "valued right" to a verdict from an empaneled jury is "subordinate[ ] to the public's interest in fair trials designed to end in just judgments." *Wade,* 336 U.S. at 689, 69 S.Ct. at 837. The established rule is that after a mistrial is declared retrial is barred unless the defendant consented to the mistrial, or there was "manifest

necessity" for the mistrial. *See, e.g., Washington,* 434 U.S. at 505, 98 S.Ct. at 830.

Because it is clear that petitioner objected to the declaration of mistrial, the central question in this case is whether manifest necessity existed for the mistrial. The unmistakable starting point for this analysis is *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824). In *Perez,* the Supreme Court first enunciated the enduring test for determining whether double jeopardy bars retrial after a mistrial:

> We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes . . . .

*Id.* at 580. In subsequent opinions the Court further explained and developed the contours of the "manifest necessity" doctrine.

■ *Perez* prescribed a case-by-case approach for this analysis. In the years since, the Court has "explicitly declined the invitation of litigants to formulate rules based on categories of circumstances which will permit or preclude retrial." *Jorn,* 400 U.S. at 480, 91 S.Ct. at 555; *see also Illinois v. Somerville,* 410 U.S. 458, 462, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973) (reiterating that the *Perez* approach "abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising in a criminal trial"); *Wade,* 336 U.S. at 691, 69 S.Ct. at 838 (noting that courts must take "all circumstances into account" when deciding whether mistrial is appropriate, thereby precluding the application of "a rigid formula"). The manifest necessity inquiry is a flexible one, with reviewing courts analyzing the trial court's exercise of discretion in light of the particular facts and circumstances of each individual case.

■ The manifest necessity doctrine does not require us to find that the trial court had no alternative but to declare a mistrial. The Court has established that "the key word 'necessity' cannot be interpreted literally; instead . . . we assume that there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate." *Washington,* 434 U.S. at 506, 98 S.Ct. at 831. In answering the question of whether this "high degree" of necessity existed at the trial court, reviewing courts should apply greater scrutiny in some cases than it would in others. In *Washington,* the Court explained that "the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused." *Id.* at 508, 98 S.Ct. at 832 (footnotes omitted). In contrast, more deference to the trial judge is appropriate when the mistrial is based upon the trial judge's belief that a hung jury exists, and the judge's decision is entitled to special respect when the judge suspects that the jury may be biased. *Id.* at 509–10, 98 S.Ct. at 832–33.

In *Washington,* the trial court declared a mistrial in the second trial of the defendant after defense counsel made improper comments during opening argument and attempted to introduce evidence of prosecutorial misconduct in the earlier trial. The prosecution moved for a mistrial on the grounds of potential juror bias. The Court realized that the trial judge's decision that the jury was biased was entitled to great deference, but also recognized that it still had a duty to inquire into whether the judge exercised sound discretion. It explained that "[t]he trial judge . . . 'must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate.'" *Id.* at 514, 98 S.Ct. at 835 (quoting *Jorn,* 400 U.S. at 486, 91 S.Ct. at 557–58). The Supreme

Court concluded that manifest necessity existed for a mistrial in *Washington* because defense counsel had "aired improper and highly prejudicial evidence" and because the trial judge, "evincing a concern of the possible double jeopardy consequences of an erroneous ruling, ... gave both the defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial." *Id.* at 515–16, 98 S.Ct. at 835.

In summary, a long history of Supreme Court precedent has bolstered and reaffirmed the doctrine established in *Perez*. Mistrials should not be declared unless "there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *Perez*, 22 U.S. (9 Wheat.) at 580. Although trial courts should be accorded deference in making this determination, they must employ sound discretion and must consider the defendant's right to end his confrontation with the state through a verdict from the particular tribunal that he faces. The judicial power to declare a mistrial "ought to be used with the greatest caution, under urgent circumstances, and for plain and obvious causes." *Id.*

### D. Analysis

■ We start our analysis of this case with the trial judge's order excluding evidence that petitioner faced a life sentence. The trial court based its order on what it considered an Ohio rule that juries should never consider potential sentences in determining guilt or innocence. In this case, however, petitioner's defense was that he confessed to the crime after reading the statutory penalty of mandatory life imprisonment when Detective Mathews suggested that therapy or psychiatric counseling might be available if he confessed. Petitioner sought to challenge the credibility of his own confession by establishing that he confessed not because he was guilty but to avoid a long sentence of imprisonment, here a life sentence. Thus, petitioner's defense required him to establish that at the time of his confession he knew that a conviction would carry such a sentence.

In *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), the Supreme Court held that it was unconstitutional for a court to prevent a defendant from challenging the credibility of his confession by excluding all evidence of the circumstances under which the confession was made. The trial court in this case attempted to chart a path between *Crane*'s holding that a court may not preclude defendant from challenging the credibility of his confession and what it considered to be a hard and fast Ohio rule against informing the jury of the specific penalty for a crime. The order ambiguously stated that the defendant "may have the testimony that he was shown the penalty from the statute and specify what the penalty is short of stating the penalty." Joint Appendix at 160. Both parties and the court recognized that the petitioner would not be allowed to inform the jury that he faced life imprisonment. Beyond that, the exact scope of the order was not clear.

In his opening statement, defense counsel described petitioner's fears of potential rape and abuse if he were to be imprisoned. The prosecution objected, but the court overruled it, allowing petitioner to continue with his theory that fear of punishment motivated his confession. The controversy about the limits of the judge's order reemerged during cross examination of Detective Mathews, when petitioner's counsel elicited that probation was not available for the offense with which petitioner had been charged. At this point, respondent objected and moved for a mistrial, which the court granted.

Respondent, relying upon *State v. Bayse*, 122 Or.App. 608, 859 P.2d 542 (1993), argues that petitioner's violation of the court order established manifest necessity for a mistrial. In *Bayse*, an Oregon appellate court held, under state law, that manifest necessity for mistrial is established by defense counsel's deliberate and repeated attempts to undermine a pre-trial order. The federal law governing manifest necessity, however, shuns categorical justifications for mistrials. Even if counsel violates a pre-trial order, manifest necessity must be determined by looking at all the circumstances of the case. *See, e.g., Jorn*, 400 U.S. at 480, 91 S.Ct. at 555 (noting that the "Court has, for the most part, explicitly declined the invitation of litigants to formulate rules based on categories of circumstances which will permit or preclude re-

**330**

trial"). In this case, it is not even clear that petitioner violated the court's order allowing him to "have the testimony that he was shown the penalty from the statute and specify what the penalty was short of stating the penalty." Petitioner's counsel was allowed to state, over respondent's objections, both that a penalty was shown to him and his fears of being raped and abused in prison. The additional information that probation was not an option, without reference to the length of imprisonment, did not clearly violate the language of the court order. In these circumstances, we decline to hold that the trial court had manifest necessity to declare a mistrial merely because it considered defense counsel's conduct to have violated its pretrial order.[1]

Respondent also argues that the trial court had manifest necessity to declare a mistrial because petitioner exposed the jury to the irrelevant and inadmissible information that probation was not available for the charge. It asserts two reasons why Detective Mathews' statement that he knew that probation would not be available if petitioner were convicted was irrelevant. First, the statute that petitioner read does not mention probation; and second, the real issue was what petitioner thought the statute meant, not what Detective Mathews knew it meant. Respondent argues that the trial court correctly decided that an instruction could not remedy the bias petitioner had instilled in the jury, thereby necessitating a mistrial. According to the trial court, the jury was prejudiced by the cumulative effect of petitioner's repeated emphasis, from opening statements onward, of the punishment that would accompany conviction. The trial judge decided that the potential for prejudice became irreparable when the jury learned that probation would not be available during Detective Mathews' cross-examination testimony. The trial judge believed that at this point petitioner's fears of what might happen in prison would become certainties in the minds of the jurors.

We find that, even if Detective Mathews' testimony was irrelevant, the amount of prejudice that could have existed, if any existed

at all, was minuscule. During the cross examination of Detective Mathews, the jury learned that probation would not be available, but it never learned the length of the sentence that would be imposed. Without knowing the length of the sentence that petitioner faced, the fact that probation would not be available is unlikely to prejudice the jury or affect its ability to reach an impartial verdict. When the penalty is "stiff," no juror would expect a defendant to receive probation. Although the decision of a trial court to declare a mistrial based on potential juror bias is entitled to special respect, it would be an unreasonable application of the law, as established by Supreme Court precedent, to conclude that manifest necessity existed for a mistrial in this case. We agree with the District Court that a simple corrective instruction would have sufficiently protected against juror bias. Because this case lacks the urgent circumstances or high degree of necessity required to justify a mistrial, double jeopardy bars the retrial of petitioner.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the District Court.

---

1. The District Court, in granting petitioner's writ of habeas corpus, held that the judge violated petitioner's constitutional right to due process when it enforced its pre-trial order. We do not reach this issue because we find that regardless of the order's constitutionality there was no manifest necessity for a mistrial.