*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0221p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LAWRENCE WALLS,

*Petitioner-Appellee,*

*v.*

No. 06-3472

KELLEH KONTEH, Warden,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 04-07352—David A. Katz, District Judge.

Argued: March 13, 2007

Decided and Filed: June 15, 2007

Before: NORRIS, GILMAN, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Diane Mallory, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellant. John F. Potts, LAW OFFICE OF JOHN F. POTTS, Toledo, Ohio, for Appellee. **ON BRIEF:** Diane Mallory, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellant. John F. Potts, LAW OFFICE OF JOHN F. POTTS, Toledo, Ohio, for Appellee.

NORRIS, J., delivered the opinion of the court, in which McKEAGUE, J., joined. GILMAN, J. (pp. 8-12), delivered a separate dissenting opinion.

---

## OPINION

---

ALAN E. NORRIS, Circuit Judge. Warden Kelleh Konteh appeals from the judgment of the district court granting petitioner Lawrence Walls a writ of habeas corpus based upon its conclusion that the *sua sponte* declaration of a mistrial by the judge in his state-court trial violated petitioner's right not to be placed twice in jeopardy. *Walls v. Konteh*, 418 F. Supp. 2d 962 (N.D. Ohio 2006). This appeal requires us to balance petitioner's double jeopardy interest against the determination of the state trial judge that calamitous events occurring outside the courtroom – the September 11, 2001 attacks upon the World Trade Center and Pentagon – created the kind of "manifest necessity" that justified a mistrial. While there are undoubtedly considerations that weigh in favor of the contrary position, we conclude that the trial judge acted within the bounds of his discretion in view of the novel and fluid circumstances that existed at the time of his decision. Specifically, he expressed

1

concern that the jurors would be so distracted by outside events that they would be unable to focus on the trial, thereby compromising petitioner's right to a verdict based upon the evidence.

Because this case comes to us in a habeas posture, a writ may issue only if we conclude that the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). For the reasons that follow, we hold that the Ohio Court of Appeals' affirmance of the declaration of a mistrial was neither "contrary to," nor an "unreasonable" application of, federal law. Consequently, the judgment of the district court must be reversed.

**I.**

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). This consideration, coupled with the fact that the underlying facts are essentially undisputed, make the summary provided by the Ohio Court of Appeals the best place to begin our analysis:

> On May 31, 2001, appellant was indicted on one count of aggravated robbery, one count of aggravated burglary, one count of felonious assault, and one count of robbery. A jury trial commenced on September 10, 2001. On September 11, 2001, the trial judge *sua sponte* declared a mistrial and rescheduled the case for a pretrial hearing on September 17, 2001. On September 18, 2001, appellant filed a motion to dismiss the case on the grounds of double jeopardy. On October 9, 2001, a visiting judge conducted a hearing on the motion and found that the trial judge had not abused his discretion in *sua sponte* granting a mistrial.
>
> A bench trial commenced on November 5, 2001. On November 6, 2001, appellant was found guilty of aggravated robbery with a firearm specification, aggravated burglary with a firearm specification, and the second degree felony offense of robbery. He was sentenced to 11 years in prison. . . .
>
>            . . . .
>
> At the dismissal hearing, the Honorable Charles S. Wittenberg testified that he was presiding over appellant's trial on the morning of September 11, 2001. The state had rested its case the day before and the defense was scheduled to begin its case with an alibi witness. Judge Wittenberg testified that before the trial began that morning he was informed that terrorists had just crashed an airliner into the World Trade Center in New York City. The jurors were unaware of the unfolding events. During testimony, the judge received a note from someone informing him that there had been a "bombing" at the pentagon and another plane crash in Pennsylvania. The Judge testified that he also received information that a plane containing a bomb was flying from the city of Cleveland towards Toledo.
>
> The Judge called a recess and asked to speak to a specific juror who was a member of the air force. Knowing the military was on active alert, Judge Wittenberg testified that he thought it was important to tell the juror about the attacks and to give him an opportunity to call his commanding officer. Both the prosecution and defense counsel agreed to the discharge of the juror.
>
> The judge testified that he then decided to recess for the day and tell the other jurors about the breaking national news. The Judge excused the jurors and instructed them to call the court later in the day to find out whether or not they should report

back to the courtroom the next morning. The attorneys were also excused. The judge testified that within a half hour of excusing the jury, the courthouse was evacuated and closed.

Soon after, Judge Wittenberg testified that he summoned the prosecutor back to the courtroom and contacted defense counsel by phone. In chambers, the judge informed counsel that: "I have no idea what's going to happen tomorrow, so at this point, I think we'll leave a message for the jurors not to return and just declare a mistrial." Defense counsel objected to the declaration.

Appellant contends that it was improper for the trial judge to *sua sponte* declare a mistrial before he had determined that a fair trial was no longer possible and before he had considered other alternatives.

The trial judge in this case testified that prior to declaring a mistrial, he was concerned about the effect the breaking national news would have on the jury. The judge noted the seriousness of the charges and testified he was worried the jurors would not be able to devote their full attention to the evidence given the fact that the country appeared to be under attack. He further testified that he considered the option of instructing the jurors to return the next day. He testified he rejected the option because, once again, he was worried about the jurors' ability to concentrate and because he did not know if the courthouse would be open the next day. Based on the particular facts in this case as well as the foregoing testimony, we conclude that the trial judge properly exercised his discretion in finding a manifest necessity for declaration of a mistrial. Appellant's sole assignment of error is found not well-taken.

*State v. Walls*, No. L-01-1492, 2003 WL 220460, at *1-2 (Ohio App. Jan. 31, 2003).

## II.

Before reviewing the legal reasoning of the Ohio Court of Appeals, which upheld the trial judge's declaration of a mistrial, it is worth remembering the lens through which AEDPA requires us to view state court decisions. As already mentioned, the writ shall not issue unless the state-court adjudication "resulted in a decision that was contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[1] This standard requires that federal courts give considerable deference to state-court decisions. *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998) ("[AEDPA] tells federal courts: Hands off, unless the judgment in place is based on an error grave enough to be called unreasonable.") (citation and quotation marks omitted).

A state-court decision is considered "contrary to . . . clearly established Federal law" if it is "diametrically different, opposite in character or nature, or mutually opposed." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (quotation marks omitted). Alternatively, to be found an "unreasonable application of . . . clearly established Federal law," the state-court decision must be "objectively unreasonable" and not simply erroneous or incorrect. *Id.* at 409-11. In short, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the

---

[1] In the alternative, AEDPA sanctions the issuance of the writ if the state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Neither party contends that the factual determinations in this case were unreasonable and our focus is therefore exclusively upon § 2254(d)(1).

relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also have been unreasonable." *Id*. at 411.

The key question, then, is whether the decision of Judge Wittenberg, as affirmed by the Ohio Court of Appeals,[2] is either contrary to, or an unreasonable application of, established United States Supreme Court precedent. *Herbert v. Billy*, 160 F.3d at 1135 ("A district court or court of appeals no longer can look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law."). Moreover, "clearly established federal law" is determined by "the holdings, as opposed to the dicta," of United States Supreme Court decisions, as of the time of the state court decision under review. *Carey v. Musladin*, 127 S.Ct. 649, 653 (2006) (quoting *Williams*, 529 U.S. at 412). The Ohio Court of Appeals reached its decision based upon the following reasoning:

> It is within a trial judge's sound discretion to grant a mistrial. *State v. Sage* (1987), 31 Ohio St.3d 173, 510 N.E.2d 343. The Double Jeopardy Clauses of the United States and the Ohio Constitutions protect against successive prosecutions and successive punishments for the same offense. *United States v. Dixon* (1993), 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556. A trial court's *sua sponte* declaration of mistrial does not violate the double jeopardy doctrine so long as (1) a manifest necessity existed or the ends of public justice would otherwise be defeated and (2) the trial court considered alternatives to declaring a mistrial. *Arizona v. Washington* (1978), 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717. A trial court has discretion to declare a mistrial where (1) "manifest necessity" or a "high degree of necessity" dictate; (2) the trial judge has no reasonable alternative to declaring a mistrial; and (3) the public interest in fair trials designed to end in just judgments is best served by ordering a mistrial. *State v. Widner* (1981), 68 Ohio St.2d 188, 190, 429 N.E.2d 1065. "It is clear that manifest necessity is not synonymous with absolute necessity, but that a 'high degree' of necessity must exist before a mistrial may properly be declared." *United States v. Cameron,* (6th Cir.Ohio 1992) 953 F.2d 240, 244, citing *Washington*, 434 U.S. at 506. In evaluating whether the declaration of a mistrial was proper in a particular case, the Supreme Court of Ohio has "declined to apply inflexible standards, due to the infinite variety of circumstances in which a mistrial may arise." *State v. Glover* (1988), 35 Ohio St.3d 18, 19, 517 N.E.2d 900, citing *Widner*, *supra*. Rather, the Ohio Supreme Court "has * * * adopted an approach which grants great deference to the trial court's discretion in this area, in recognition of the fact that the trial judge is in the best position to determine whether the situation in his [or her] courtroom warrants the declaration of a mistrial." State v. Glover, supra.

*State v. Walls*, *supra*, at *1.

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subjected for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This provision "represents a fundamental ideal in our constitutional heritage, and it . . . appl[ies] to the States through the Fourteenth Amendment." *Benton v. Maryland*, 395 U.S. 784, 794 (1969). As the Ohio Court of Appeals recognized, for our purposes the most instructive United States Supreme Court case on the subject is *Arizona v. Washington*, 434 U.S. 497 (1978). In *Washington*, the trial court declared a mistrial on the motion

---

[2] The Ohio Supreme Court did not accept this case for review. *State v. Walls*, 789 N.E.2d 1117 (Ohio 2003) (table).

of the prosecutor, who objected to "improper and prejudicial comment during defense counsel's opening statement." *Id.* at 498. The Court framed the issues before it as follows:

> The questions presented are whether the record reflects the kind of "necessity" for the mistrial ruling that will avoid a valid plea of double jeopardy, and if so, whether the plea must nevertheless be allowed because the Arizona trial judge did not fully explain the reasons for his mistrial ruling.

*Id.* Just as in the case before us, the trial judge in *Washington* "did not expressly find that there was 'manifest necessity' for a mistrial; nor did he expressly state that he had considered alternative solutions and concluded that none would be adequate." *Id.* at 501.

After discussing why double jeopardy precludes a second trial in most situations, the Court explained that a retrial is permissible when "manifest necessity" requires it. *Id.* at 505. That concept was originally defined by Justice Story as follows:

> We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes. . . . But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.

*United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824). While adopting Justice Story's "classic formulation," the Court in *Washington* emphasized that it required flexibility in its application:

> [T]hose words do not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge. Indeed, it is manifest that the key word "necessity" cannot be interpreted literally; instead . . . we assume that there are degrees of necessity and we require a "high degree" before concluding that a mistrial is appropriate.

*Id.* at 506 (footnotes omitted).

In *Washington*, the Court considered whether the trial court's perception that the jury would be impermissibly biased by the inappropriate comments of defense counsel during opening argument was entitled to deference. The Court concluded that it was: "There are compelling institutional considerations militating in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias." *Id.* at 513 (footnote omitted). This is so even when alternatives are available:

> We recognize that the extent of the possible bias cannot be measured, and that the District Court was quite correct in believing that some trial judges might have proceeded with the trial after giving the jury appropriate cautionary instructions. In a strict, literal sense, the mistrial was not "necessary." Nevertheless, the overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood

that the impartiality of one or more jurors may have been affected by the improper comment.

*Id.* at 511.

In light of the guidance provided by *Washington*, it is clear that the district court overemphasized Judge Wittenberg's failure to explore alternatives adequately before declaring a mistrial:

> There were several alternatives available to the Judge . . . which the trial court could have undertaken to avoid a mistrial or at least to investigate as to whether a mistrial was necessary. Not only could he have called the jurors back the next day and conducted voir dire to determine their ability to continue, he could have placed a message on the court telephones that the jurors should phone in on a daily basis to determine when they would be returning to the courthouse. Alternatively, because of the relatively small number of people involved, the Court Administrator or other administrative personnel could have undertaken to call the individual jurors back into service when the court activities resumed after September 11. . . .

*Walls*, 418 F. Supp. 2d at 963-64. While it is undoubtedly true that Judge Wittenberg had alternatives to a mistrial, the Supreme Court has never required that a judge consider other options when "the record provides sufficient justification for the state-court ruling." *Washington*, 434 U.S. at 516-17. *Washington*'s discussion of such considerations as the *manner* in which the trial court exercised its discretion (i.e., with or without deliberations and consideration of alternatives) is not mere dicta, but neither did the court *hold* that a declaration of mistrial without deliberate consideration of alternatives is necessarily an abuse of discretion. As *Washington* makes clear, we owe a high degree of deference to a trial judge's assessment that the jury's ability to render a verdict uninfluenced by improper considerations has been compromised.

The case before us is unusual to the extent that the perceived improper taint came from outside the courthouse. Thus, one might argue that the deference that we usually accord to a trial judge's assessment of potential prejudice should be reduced because he was in no better position to assess the threat than anyone else. As petitioner points out, another judge in the same courthouse elected to allow an on-going trial to proceed. Under the novel circumstances that existed that day, petitioner contends that Judge Wittenberg should first have explored less drastic alternatives, such as polling or making voir dire inquiry of the jury, before declaring a mistrial.

While these considerations undeniably make this a close case, they do not mean that petitioner is entitled to the writ. As the district court candidly acknowledged, "no one . . . suggests or has suggested that Judge Wittenberg behaved irrationally or irresponsibly."**[3]** *Walls*, 418 F. Supp. 2d at 964. Neither party contends that concern about the jury's ability to focus on the evidence before it is not a legitimate consideration in the "manifest necessity" calculation. That "some trial judges might have proceeded with the trial," suggesting that continuance was not strictly "necessary," does not compel the conclusion that Judge Wittenberg's decision was not an exercise of sound discretion or, much less, that its affirmance by the Ohio Court of Appeals was contrary to clearly established federal law. *Washington*, 434 U.S. at 511. If we step back for a moment and review the events facing Judge Wittenberg, it is clear that his decision comported with *Washington*. He knew of the World Trade Center and Pentagon attacks, had been told that a plane carrying a bomb was heading towards his city, and had learned that the courthouse would be evacuated without

---

**[3]** This concession distinguishes this case from the situation in *Johnson v. Karnes*, 198 F.3d 589 (6th Cir. 1999), which petitioner relies heavily upon. In *Johnson*, we found that "the trial judge failed to act rationally, responsibly or deliberately, and thus failed to exercise sound discretion as required by *Perez* and its progeny." *Id.* at 596.

knowing when it would reopen. Before declaring a mistrial, he considered the alternative course of instructing the jury to return the next day. In the press of these unfolding events, however, he concluded – quite rationally, as the district court recognized – that the jury might not be able to devote its full attention to the evidence. The Ohio Court of Appeals' affirmance of his declaration of a mistrial under these circumstances, grounded as it was on a concern about jury bias, is neither contrary to, nor an unreasonable application of, clearly established federal law as defined by any holding of the United States Supreme Court. *See Carey*, 127 S.Ct. at 654 ("Given the lack of holdings from this court regarding . . . conduct of the kind involved here, it cannot be said that the state court 'unreasonably applied clearly established Federal law.'").[4]

## III.

The judgment of the district court is **reversed** and the writ of habeas corpus is **vacated.**

---

[4] While the dissenting opinion alludes to the deferential standard of review mandated by AEDPA, it fails to identify any *holding* of the United States Supreme Court to which the Ohio Court of Appeals' ruling is contrary or of which the Ohio Court of Appeals' ruling is an unreasonable application. Instead, the dissent relies largely on Sixth Circuit decisions issued before the United States Supreme Court first made it clear in *Williams* that "clearly established federal law" is determined by the *holdings* of Supreme Court decisions. Consequently, the dissent's analysis, in our view, neglects the "principles of comity, finality and federalism" that AEDPA is designed to serve. *Dennis v. Mitchell*, 354 F.3d 511, 517 (6th Cir. 2003) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).

———————————

**DISSENT**

———————————

RONALD LEE GILMAN, Circuit Judge, dissenting.  The majority opinion cites the proper authorities and engages in the correct analysis, but I believe that it gives short shrift to one key fact that, if adequately factored in, would undermine much of its persuasiveness and lead to the opposite result.  Specifically, the state trial judge possessed no knowledge concerning the potential effect of the September 11 attacks on the ability of the jurors to fulfill their civic duties in Walls's case.  Nor, of course, could he have possessed such knowledge; attacks like these had never before occurred on American soil.  But the judge's lack of familiarity with events that were totally extraneous to Walls's trial distinguishes the present case from each of the cases cited by the majority, as well as from the two 19th-century cases cited in *Arizona v. Washington*, 434 U.S. 497, 512 (1978), as examples of the deference usually accorded to a trial court's evaluation of "possible juror bias."

In each of those cases, the event or conduct that precipitated the declaration of a mistrial bore a clearly discernible relationship to the ongoing trial.  *Washington* itself involved "improper and prejudicial" remarks made by the defendant's attorney during his opening statement that "may have affected the impartiality of the jury."  *Id.* at 510, 511.  *United States v. Jorn*, 400 U.S. 470, 473 (1971), involved the possibility that several government witnesses might incriminate themselves without full knowledge of their constitutional rights under the Fifth Amendment. *Simmons v. United States*, 142 U.S. 148 (1891), the first 19th-century case cited in *Washington*, "involved the possibility of bias caused by a newspaper story describing a letter written by defense counsel denying a charge by a third party that one of the jurors was acquainted with the defendant." *Washington*, 434 U.S. at 512 (summarizing *Simmons*).  Finally, *Thompson v. United States*, 155 U.S. 271 (1894), the second 19th-century case cited in *Washington*, involved the possibility of bias where "one of the trial jurors had served on the grand jury that indicted the defendant." *Washington*, 434 U.S. at 512 (summarizing *Thompson*).

Each of the above cases reflects the rationale underlying the basic jurisprudential principle of deference:  The reason that reviewing courts typically defer to the judgment of the initial arbiter on largely fact-based matters is that the latter's "vantage point and day-to-day experience" with such matters endows it with "an institutional advantage over appellate courts in making these sorts of determinations."  *Koon v. United States*, 518 U.S. 81, 98 (1996) (discussing federal appellate courts' deference to district courts in their application of the U.S. Sentencing Guidelines to criminal defendants); *Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionary Workers Union, AFL-CIO*, 430 U.S. 243, 253 (1977) ("[I]t is because of his special experience, expertise, and selection by the parties that courts generally defer to an arbitrator's interpretation of the collective-bargaining agreement.").

The same principle applies in the present context of manifest-necessity determinations based on possible juror bias, as the Supreme Court reiterated in *Washington*:

> There are compelling institutional considerations militating in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias.  He has seen and heard the jurors during their *voir dire* examination.  He is the judge most familiar with the evidence and the background of the case on trial.  He has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors.  In short, he is far more "conversant with the factors relevant to the determination" than any reviewing court can possibly be.

434 U.S. at 513-14 (footnotes omitted).

As noted above, however, the state trial judge in the present case was in no way "conversant" with how large-scale terrorist attacks would affect totally unrelated trial proceedings when the events of September 11, 2001 occurred. This was through no fault of his own, to be sure. How was the judge, more than anyone else, supposed to know what the effects of the attacks on the jurors might be? The answer is simply that without asking them—which the judge undisputedly failed to do —he could not have known. He therefore was not any "better positioned" than either the Ohio Court of Appeals or ourselves to make a manifest-necessity determination on the basis of possible juror bias. *See Pierce v. Underwood*, 487 U.S. 552, 560 (1988) (explaining the rationale underlying the abuse-of-discretion standard in a case involving a district court's authority to award attorney fees under the Equal Access to Justice Act).

In short, the majority correctly states *as a general principle* that "[t]here are compelling institutional considerations militating in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias." Maj. Op. at 5 (quoting *Washington*, 434 U.S. at 513). And concern about juror bias is indeed "a legitimate consideration in the 'manifest necessity' calculation." Maj. Op. at 6. But the problem in the present case is the impossibility of abstractly divining what the bias would have been. Because the trial judge could not have known the answer, deference to his uninformed judgment to declare a mistrial is less reasonable than under normal circumstances where the bias-precipitating event bears a direct relationship to the trial at issue.

Caselaw from this circuit provides support for my conclusion. *Johnson v. Karnes*, 198 F.3d 589, 597 (6th Cir. 1999), is our leading case in this area, where the court issued a writ of habeas corpus because "the state trial court failed to exercise 'sound discretion' in declaring a mistrial." In *Johnson*, the defense attorney asked the victim on cross-examination whether he was aware of the defendant's prior acquittal for robbery. *Id.* at 591. The trial judge immediately convened a sidebar, where he expressed anger at the defense attorney for having asked the question and indicated to the prosecutor that he would grant a mistrial "if you want [it]." *Id.* at 592. After a brief, 10-to-15-minute recess, and after conducting another, more thorough sidebar conference with both attorneys present, the judge declared a mistrial over the defendant's objection. *Id.*

Johnson sought habeas relief based upon the trial court's subsequent denial of his motion to dismiss the remaining counts against him on double-jeopardy grounds. The district court denied Johnson's habeas petition, but this court reversed, holding that "manifest necessity" did not justify the mistrial. *Id.* at 597. As the majority here points out, the *Johnson* court determined that "the trial judge failed to act rationally, responsibly or deliberately, and thus failed to exercise sound discretion as required by [*United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824)] and its progeny." Maj. Op. at 6 n.3 (quoting *Johnson*, 198 F.3d at 596). The trial judge's declaration of a mistrial was accordingly determined to be an "unreasonable application" of clearly established federal law. *Id.* at 597. Judge Boggs vigorously dissented, emphasizing that because the judge "heard argument by both sides" before declaring a mistrial, he cannot be said to have acted "irrationally or irresponsibly." *Id.* at 598 (Boggs, J., dissenting) (quoting *Washington*, 434 U.S. at 514).

Interestingly, the reasoning of Judge Boggs's pro-government dissent in *Johnson* actually supports the district court's decision to grant Walls a habeas writ in the present case. Judge Boggs reached his conclusion by distinguishing "[t]he primary cases from this circuit cited to support" the majority's decision to grant habeas relief to Johnson. *Id.* at 598 (Boggs, J., dissenting). These were *Glover v. McMackin*, 950 F.2d 1236 (6th Cir. 1991), and *Harpster v. Ohio*, 128 F.3d 322 (6th Cir. 1997).

Regarding *Glover*, Judge Boggs stressed that the "judge declared a mistrial without any motion or argument, in the midst of a heated cross-examination." *Johnson*, 198 F.3d at 598 (Boggs, J., dissenting) (discussing *Glover*). Therefore, "the judge's actions in *Glover* were a far cry from what happened in [*Johnson*], where argument was permitted, and the judge did not make a final

ruling until after a motion had been made." *Id.* The facts of the present case fit more closely with *Glover* than with *Johnson*. To be sure, the trial judge met with both the prosecutor (in person) and the defense attorney (by phone) and gave each a chance to raise objections or other concerns prior to the judge's official declaration of a mistrial. But the judge admitted in his later testimony that he had made up his mind to declare a mistrial *before* contacting counsel for their views. The prosecutor, moreover, never made a motion for a mistrial, unlike in *Johnson*; the mistrial was instead declared by the judge sua sponte, as in *Glover*.

Most critically, the judge here by his own admission never gave any consideration whatsoever—either at the time that he declared the mistrial or in his post-judgment testimony—to Walls's constitutional right not to be subjected to double jeopardy. This, if nothing else, the judge was required to do. As the Supreme Court clearly stated in *Jorn*, 400 U.S. at 558, "in the final analysis, the judge must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *See also Washington*, 434 U.S. at 515 (emphasizing that the trial judge, in compliance with *Jorn*, had "evinc[ed] a concern for the possible double jeopardy consequences of an erroneous ruling" and "accorded careful consideration to respondent's interest in having the trial concluded in a single proceeding"). "The 'particular tribunal' principle [underlying the prohibition on double jeopardy] is implicated whenever a mistrial is declared over the defendant's objection and without regard to the presence or absence of governmental overreaching." *Washington*, 434 U.S. at 508 n.25 (quotation marks omitted). These were the precise circumstances surrounding the mistrial declaration in the present case.

Regarding *Harpster*, Judge Boggs emphasized that case's conclusion that the "amount of prejudice that could have existed [on account of the borderline improper testimony for which the mistrial was declared], if any existed at all, was minuscule." *Harpster*, 128 F.3d at 330 (noting that not even the very basis for the mistrial—namely, the defense counsel's violation of a pretrial order—was clear from the record). The trial judge's failure to consider alternatives to a mistrial was accordingly fatal to a finding of "manifest necessity" because a "simple corrective instruction would have been adequate" to cure whatever prejudice did exist. *Johnson*, 198 F.3d at 598 (Boggs, J., dissenting) (discussing *Harpster*) (quotation marks omitted). Judge Boggs thus clarified that any discussion of the consideration-of-alternatives factor of the manifest-necessity analysis must occur "in the context" of the degree of possible prejudice involved. *Id.*

Stated differently, Judge Boggs's basic point was that a standard of proportionality is at play in these cases: the lesser the amount of possible prejudice involved, the greater the trial judge's responsibility to consider alternative curative measures to a mistrial. Judge Boggs impliedly agreed with the result in *Harpster*, where the degree of possible prejudice was "minuscule or nonexistent." *Johnson*, 198 F.3d at 598 (Boggs, J., dissenting). *Johnson*, conversely, where the degree of possible prejudice was by comparison much greater, was wrongly decided in his opinion. Judge Boggs instead would have ruled as the Supreme Court did in *Washington*—that is, "[s]ince the record provides sufficient justification for the state-court ruling, the failure to explain that ruling more completely does not render it constitutionally defective." *Id.* at 598-99 (Boggs, J., dissenting) (quoting *Washington*, 434 U.S. at 516-17).

Again, the facts of the present case align more closely with *Harpster* ("miniscule or nonexistent" prejudice) than with *Johnson* and/or *Washington*. Certainly, the trial judge's instincts to safeguard Walls's presumptive innocence are laudable. But attempting to understand how the attacks of September 11 would have prejudiced the jury against Walls strains the imagination. The two have nothing in common. Hijacking jetliners for use as guided missiles versus robbing a residence at gunpoint, although both violent criminal acts, are otherwise incomparable. The September 11 terrorists sought the death of American lives and the destruction of recognizable

symbols of American power. Walls's alleged actions sought only money. The terrorists' attacks killed approximately 3,000 people. Walls's alleged actions resulted in no deaths at all. Finally, regarding more tangible indices such as physical appearance that typically account for "spillover effect," those responsible for the September 11 attacks were of Middle Eastern origin and Islamic beliefs. Nothing in the record indicates that Lawrence Walls was of either.

The likelihood that the attacks would have prejudiced the jury against Walls was therefore, as in *Harpster*, "minuscule or nonexistent." *Johnson*, 198 F.3d at 598 (Boggs, J., dissenting) (discussing *Harpster*). Regarding the trial judge's principal concern (expressed for the first time during his post-judgment testimony) that the focus on the attacks would divert the jury's attention from the case before them, he simply had no basis to make such an assumption. He had not been confronted with similar circumstances at any point in his judicial career, much less on a regular, "day-to-day" basis. *See Koon*, 518 U.S. at 98. If anything, the fact that Walls's counsel objected to the mistrial should have indicated to the judge that his assumption of divided-attention-based prejudice was faulty, requiring that an actual inquiry be made into the matter. Such an inquiry was especially critical because this was not a case where, as in *Washington*, "the record provides sufficient justification for the state-court ruling." 434 U.S. at 516-17. The record, in fact, provides no justification at all for any of the trial judge's alleged grounds for declaring the mistrial. *Compare id.* at 517 (noting that the record included "the extensive argument of counsel prior to the judge's ruling").

To be sure, the majority properly concedes that "[t]he case before us is unusual to the extent that the perceived improper taint came from outside the courthouse." Maj. Op. at 6. What makes this case unusual, however, is not simply that the "perceived improper taint came from outside from courthouse," but more specifically that it derived from events that were completely unprecedented and beyond the realm of ordinary human experience. This additional characteristic of the September 11 attacks distinguishes the present case from those involving other "outside the courthouse" taints—for example, the death of a prospective witness or of a juror's family member—where the judge would be far more capable of gauging the potential effect of the taint on the jury.

Undisputedly, AEDPA requires federal courts to give considerable deference to state-court decisions. *See Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998) ("[AEDPA] tells federal courts: Hands off, unless the judgment in place is based on an error grave enough to be called unreasonable.") (quotation marks omitted). As applied to the present case, therefore, AEDPA adds another layer of deference onto a largely fact-based ruling that is already entitled to substantial deference. But AEDPA deference is not absolute, as each of the numerous post-1996 cases granting a writ of habeas corpus attests. A critical footnote in *Washington* that is not mentioned by the majority is directly relevant to the degree of deference that we should afford in the present case:

> It should be noted, however, that the rationale for this deference in the "hung" jury situation is that the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate. *If the record reveals that the trial judge has failed to exercise the "sound discretion" entrusted to him, the reason for deference by an appellate court disappears. Thus, if the trial judge acts for reasons completely unrelated to the trial problem which purports to be the basis for the mistrial ruling, close appellate scrutiny is appropriate.*

434 U.S. at 510 n.28 (emphasis added).

The failure of the Ohio Court of Appeals to recognize the inapplicability of deferential review to the facts of this case—as mandated by the same Supreme Court precedent on which it

otherwise relied—renders its ruling unreasonable within the meaning of AEDPA. I would therefore **AFFIRM** the judgment of the district court.