*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0044p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DENNY ROSS,

      *Petitioner-Appellee/Cross-Appellant,*

      *v.*

JAMES PETRO, Attorney General for the State of
Ohio,

      *Respondent,*

SUMMIT COUNTY COURT OF COMMON PLEAS,

      *Respondent-Appellant/Cross-Appellee.*

Nos. 05-4212/4213

>

---

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 04-00849—David D. Dowd, Jr., District Judge.

Argued: September 10, 2007

Decided and Filed: January 25, 2008

Before: GUY, ROGERS, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Matthew E. Meyer, OFFICE OF THE PROSECUTING ATTORNEY, Cleveland, Ohio,
for Appellant. Jacob A. Cairns, LAW OFFICE, Columbus, Ohio, for Appellee. **ON BRIEF:**
Matthew E. Meyer, Jon W. Oebker, OFFICE OF THE PROSECUTING ATTORNEY, Cleveland,
Ohio, for Appellant. Jacob A. Cairns, LAW OFFICE, Columbus, Ohio, Max Kravitz, KRAVITZ,
BROWN & DORTCH, Columbus, Ohio, David Z. Chesnoff, CHESNOFF & SCHONFELD, Las
Vegas, Nevada, Lawrence J. Whitney, Sr., BURDON & MERLITTI, Akron, Ohio, for Appellee.

      McKEAGUE, J., delivered the opinion of the court, in which ROGERS, J., joined. GUY,
J. (pp. 15-16), delivered a separate dissenting opinion.

---

## OPINION

---

      McKEAGUE, Circuit Judge. Following four weeks of trial on murder, kidnaping, rape and
other charges, and during the second day of jury deliberations, the Ohio trial court declared a
mistrial after receiving a note from the foreperson indicating the jury's deliberations had been

1

tainted by extraneous information. Prior to commencement of the second trial, however, the trial court, in the person of a replacement visiting judge, granted defendant Denny Ross's motion to bar reprosecution on double jeopardy grounds, concluding there was no "manifest necessity" for mistrial. This ruling was reversed by the Ohio Court of Appeals and the Ohio Supreme Court denied leave to appeal. Defendant thereupon sought pretrial habeas relief in federal court, which was granted. The district court held that the Ohio Court of Appeals' ruling represents an unreasonable application of clearly established federal law. On appeal, the Summit County Court of Common Pleas contends the district court failed to abide by the deferential standard of review made applicable by the Anti-Terrorism and Effective Death Penalty Act. For the reasons that follow, we agree. The district court's judgment granting the writ of habeas corpus will therefore be reversed.

## I. BACKGROUND

The material facts are not disputed. In connection with the murder of 18 year-old Hannah Hill, defendant Denny Ross was charged in Summit County Court of Common Pleas with murder, aggravated murder, rape, kidnaping, tampering with evidence, and abuse of a corpse. Trial commenced on September 28, 2000. At the close of the prosecution's case, the trial court, Judge Jane Bond, granted defendant's motion for judgment of acquittal on the kidnaping charge. The defense presented no proofs and the jury began deliberating on October 27, 2000. Early in the afternoon of Saturday, October 28, the jury having resumed its deliberations after its lunch break, Judge Bond received a note from the foreperson. After advising counsel for the parties and giving both sides an opportunity to consider the note's ramifications, Judge Bond convened a hearing at 3:50 p.m. and read the contents of the note into the record:

> THE COURT: All right. For purposes of the record, the jury is not present. Court received from the bailiff the following note from the jury as follows:
>
> "There is concern about a juror. I was approached by a spokesperson for four other jurors. From comments made by this juror these four jurors feel that he is agreeing with the group to expedite this process. I was told by these jurors that they [sic] following comments were made." And that's verbatim.
>
> "No. 1, we need to get this done today.
>
> "No. 2, why are we even discussing this. He has stated all along that he believes one thing but has all too quickly changed his vote to go along with the group. This morning this juror stated to me that we need to finish this today as he will be leaving after today because he has a problem at home but he did not want to put us in that position.
>
> "To another juror he made the comment that he knows that Brad O'Born was innocent because he passed a polygraph test so Denny Ross had to be guilty.
>
> "I have been asked if this juror can be released so that he may attend to his affairs at home and we can have an impartial and fair jury."
>
> It's signed, "Juror No. 4."

Trial tr. pp. 1264-65, JA 43-44.[1]   Judge Bond then, with reference to Ohio Rev. Code § 2945.36, gave the prosecutor and defense counsel opportunity to comment on whether either consented to discharge of the jury without prejudice to the prosecution.[2]

The prosecutor consented, but defendant did not.  Observing that the extraneous information that had come to light was not favorable to the defense, defendant requested essentially that the jury be instructed to continue deliberating and that a mistrial be declared, at defendant's option, only if an adverse verdict (evidencing the possible influence of the extraneous information) were returned. Alternatively, defendant moved for a mistrial with prejudice.  The trial court denied both requests.

The court went on to repeatedly invite a request from either side to conduct a *voir dire* examination of any of the jurors.  Neither the prosecution nor the defense wished to interfere with the pending deliberations.  In fact, Judge Bond later characterized defendant's counsel's objection to *voir dire* as "vociferous" and "adamant."  Hrg. tr. pp. 143-44, JA 249-50.  Judge Bond proceeded to explain her belief that the jury note was "extremely damaging to the prospect that you [defendant] could receive a fair trial" inasmuch as it indicated "that at least one juror believes you're guilty based upon no evidence that was presented during this trial."  Trial tr. p. 1271, JA 50.[3]  Judge Bond believed that the problem juror had engaged in misconduct, and that his misconduct had "impeded full and fair deliberation of the evidence" by other jurors.  *Id*. at 1272, JA 51.  Judge Bond was "absolutely convinced" there was no way to "unring" the bell that had been rung.  *Id*.  She considered but rejected the notion of seating an alternate juror in place of the problem juror.  Judge Bond therefore found there to be "corruption of a juror" pursuant to Ohio Rev. Code § 2945.36(A), and determined that the jury could not render a fair and impartial verdict in accordance with the law. On the record, she declared a mistrial without prejudice to the prosecution and discharged the jury.

Then, Judge Bond, alone, met with the jury in the jury room.   She explained to the jurors what she had done, learned that some of the jurors were "extremely upset," and invited any who had concerns to speak with her privately in her chambers.  Hrg. tr. p. 104, JA 210.  Five jurors spoke individually with Judge Bond.  During one of these conversations, she learned for the first time that the jury had completed and signed verdict forms unanimously finding defendant not guilty of the charged offenses of murder, aggravated murder and rape (though the jury had not yet reached a

---

[1]Brad O'Born apparently was the boyfriend of the victim and was a suspect in the investigation of her death. No evidence was introduced at trial that O'Born had ever been subject to polygraph examination.  However, Judge Bond recalled that this information had been the subject of pretrial publicity in the Akron Beacon Journal newspaper.  Hrg. tr. p. 160-61, JA 266-67.

[2]Ohio Rev. Code § 2945.36 provides:

The trial court may discharge a jury without prejudice to the prosecution:
(A)      For the sickness or corruption of a juror or other accident or calamity;
(B)      Because there is no probability of such jurors agreeing;
(C)      If it appears after the jury has been sworn that one of the jurors is a witness in the case;
(D)      By consent of the prosecuting attorney and the defendant.
The reason for such discharge shall be entered on the journal.

[3]Judge Bond's construction of the note as signaling a development adverse to defendant's interests is incomplete.  The note can also be read as implying that at least a majority of the jurors were inclined to find defendant not guilty and that a "hold-out juror," whose contrary view was impermissibly based at least in part on extraneous information, had decided to "give in" in order to facilitate the reaching of a unanimous verdict by the end of the day. Standing alone, the supposed polygraph test results did not, of course, work in defendant's favor.  But the context in which the information arose suggested that, to the extent the information had been shared, it had not swayed other jurors; and, in fact, the disseminator of the information had even decided to abandon his reliance on it in casting his own vote. In sum, then, the note appeared to be good news to defendant.

decision on the remaining two charges, tampering with evidence and abuse of a corpse).  Judge Bond instructed her bailiff to retrieve the verdict forms from the jury room.  She then released the jurors without making further inquiry about the juror misconduct and without giving counsel a chance to speak with them.  Only after the jurors had left the building did Judge Bond advise counsel of the signed verdict forms.

A new trial was set to commence on January 8, 2001.  Defendant moved the court to bar retrial on double jeopardy grounds.  He also moved to disqualify Judge Bond from hearing the motion, as she would likely be called as a witness.  The motion to disqualify was granted and Visiting Judge Joseph Cirigliano was assigned to the case.  He conducted an evidentiary hearing on the motion to bar retrial on May 22, 2001.  Judge Cirigliano granted the motion to bar retrial in an opinion issued February 15, 2002.  He summarized the rationale for his decision as follows:

> In the present case there existed no manifest necessity for declaring a mistrial.  Reasonable alternatives to a mistrial existed and the public interest in fair trials designed to end in just judgments was not met by the trial court's declaration of a mistrial.  The trial court abused its discretion in declaring a mistrial because it failed to investigate the information set forth in the jury note, it failed to explore alternatives to declaring a mistrial, it failed to take into consideration the verdicts that had been reached by the jury, it failed to ascertain whether any prejudice existed as a result of the information related in the foreperson's note, it failed to attempt to cure any taint which may have existed, it acted precipitately in the declaration of a mistrial, and it failed to duly consider the defendant's right to have his trial completed by a particular tribunal, especially in light of the fact that this is a capital case.

Opinion pp. 15-16, JA 341-42.

The State of Ohio appealed this ruling.  In a 2-1 decision filed on December 31, 2002, the Ninth Judicial District Court of Appeals reversed.  The court of appeals determined that Judge Cirigliano erred by failing to confine his scrutiny of the record to the facts known to Judge Bond at the time she declared a mistrial and by applying an erroneous legal standard, which constituted an abuse of discretion.  The court of appeals explained that "manifest necessity" does not mean "absolute necessity."  Decision pp. 11-12, JA 353-54.  The court concluded that Judge Bond had exercised "sound discretion" in that she "allowed the parties to state their positions, considered their competing interests, and made a thorough inquiry into reasonable alternatives prior to declaring a mistrial in this case."  *Id.* at 13, JA 355.  The court held that Judge Bond was entitled to take the note at face value and was therefore justified in her conclusion that the jury had been tainted by juror misconduct in a way that could not be purged.  *Id.*  The court held that Judge Cirigliano failed to give proper weight to "the public's interest in fair trials designed to end in just judgments."  *Id.* at 14-15, JA 356-57.  Judge Bond was held not to have abused her discretion by failing to consider alternatives not proposed by the parties or by failing to conduct *voir dire* examination of any jurors over the parties' objection.

After the Ohio Supreme Court declined to hear defendant Ross's appeal from the court of appeals' ruling, he filed his habeas petition in the Northern District of Ohio on May 6, 2004.  The petition was first evaluated by Magistrate Judge Kenneth S. McHargh, who issued a 74-page report and recommendation on May 3, 2005, recommending that the petition be granted. On August 22, 2005, District Judge David D. Dowd, Jr., issued his own 36-page opinion and order overruling objections to the report and recommendation and granting habeas relief.  Applying the standard of review prescribed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), the district court concluded that a holding that Judge Bond's "manifest necessity" determination was based on

a "scrupulous exercise of judicial discretion" could only proceed from an unreasonable application of clearly established federal law.  Memorandum Opinion at 24-25, JA 469-70.

On appeal, Summit County Court of Common Pleas insists the Ohio Court of Appeals' decision passes muster under AEDPA review and contends the district court's order granting habeas relief should therefore be reversed.

## II.  ANALYSIS

### A.  Standard of Review

We review the district court's decision to grant the writ of habeas corpus *de novo*.  *Linscott v. Rose*, 436 F.3d 587, 590 (6th Cir. 2006).

The "manifest necessity" question presented in this case has now been reviewed by numerous judges and has yielded several carefully reasoned opinions, among which there is no consensus.  As the manifest necessity question finally reaches us on appeal in habeas, the merits of the question are viewed through multiple lenses of deference.  Foremost among these lenses is that prescribed by Congress in AEDPA.  Pursuant to AEDPA,  in relevant part, a writ of habeas corpus shall not issue unless the state court adjudication "resulted in a decision that was contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  In *Walls v. Konteh*, 490 F.3d 432 (6th Cir. 2007), this Court recently explained and underscored the meaning of this standard in the context of an analogous double jeopardy claim:

> A state-court decision is considered "contrary to . . . clearly established Federal law" if it is "diametrically different, opposite in character or nature, or mutually opposed."  *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (quotation marks omitted).  Alternatively, to be found an "unreasonable application of . . . clearly established Federal law," the state court decision must be "objectively unreasonable" and not simply erroneous or incorrect.  *Id*. at 409-11.  In short, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.   Rather, that application must also have been unreasonable."  *Id*. at 411.
>
> . . . .
>
> Moreover, "clearly established federal law" is determined by "the holdings, as opposed to the dicta," of United States Supreme Court decisions, as of the time of the state court decision under review.  *Carey v. Musladin*, — U.S. — , 127 S.Ct. 649, 653 (2006) (quoting *Williams*, 529 U.S. at 412).

*Walls*, 490 F.3d at 436.  Hence, the AEDPA standard of review requires the federal courts to give considerable deference to state court decisions.  *Id*. at 435-36.

The substantive law defining a defendant's rights under the Double Jeopardy Clause is set forth most relevantly in *Arizona v. Washington*, 434 U.S. 497 (1978), where the Court addressed the matter explicitly and thoroughly.  In *Washington*, the Court reversed a ruling by the Ninth Circuit which had affirmed a grant of habeas relief based on double jeopardy.  The Court held that the Ninth Circuit, by requiring an explicit finding of manifest necessity and explicit consideration of alternatives by the trial court, had "attached undue significance to the form of the ruling."  *Id*. at 503.

The *Washington* court recognized that a defendant's right, pursuant to the Double Jeopardy Clause, to have his trial, once commenced, completed by a particular tribunal, is a "valued right," but one which must sometimes "be subordinated to the public's interest in fair trials designed to end

in just judgments." *Id.* at 503 n. 11. To proceed with a retrial after a mistrial has been declared over the defendant's objection in the first criminal trial, the prosecution must shoulder the "heavy burden" of demonstrating "manifest necessity." *Id.* at 505. "Manifest necessity" is not to be interpreted literally or applied mechanically; what is required is a "high degree" of necessity. *Id.* at 506. In assessing whether retrial should be barred, a sliding scale of scrutiny is employed, one that depends on the reasons for the mistrial. The strictest scrutiny is employed when the mistrial was premised on bad-faith conduct by the judge or prosecutor, and the most relaxed scrutiny is employed when the mistrial was premised on a deadlocked jury. *Id.* at 508-09.

When a mistrial is premised on the prejudicial impact of improper evidence or argument, the trial judge's evaluation of the *possibility* of juror bias is entitled to "great deference." *Id.* at 511-14. Notwithstanding this deference, the reviewing court must be satisfied that the trial judge did not act irrationally or irresponsibly, but exercised "sound discretion." *Id.* at 514. The trial court's failure to make an explicit finding of "manifest necessity" does not render a mistrial declaration invalid, as long as the record provides sufficient justification for the ruling. *Id.* at 516-17.

Applying these principles, the *Washington* Court reversed the Ninth Circuit's ruling and upheld the trial court's declaration of a mistrial based on improper argument made by defense counsel in his opening statement. In reaching this result, the Court determined that the trial judge "exercised sound discretion" even though he made no explicit finding of manifest necessity and even though the mistrial was not strictly "necessary" inasmuch as the possibility of juror bias might have been neutralized by the giving of an appropriate cautionary instruction. "Nevertheless," the Court observed, "the overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." *Id.* at 511. The Court explained why this deference is appropriate:

> There are compelling institutional considerations militating in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias. He has seen and heard the jurors during their *voir dire* examination. He is the judge most familiar with the evidence and the background of the case on trial. He has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors. In short, he is far more "conversant with the factors relevant to the determination" than any reviewing court can possibly be.

*Id.* at 513-14 (footnote, citation omitted).

Thus, a federal court acting in habeas and reviewing state court rulings on the declaration of a mistrial based on the possibility of juror bias is obliged to scrutinize the state court rulings through two lenses of deference.

**B. District Court Opinion**

The district court's opinion is marked by a fundamental flaw. It misapprehends the controlling federal law and consequently fails to accord due deference to the Ohio Court of Appeals' ruling, per AEDPA.

In holding that the Ohio Court of Appeals' ruling represents an unreasonable application of clearly established federal law, the district court adopted five words from the Supreme Court's plurality opinion in *United States v. Jorn*, 400 U.S. 470, 485 (1971), "scrupulous exercise of judicial discretion," as the "holding" said to embody the state of "clearly established federal law" when the Ohio Court of Appeals issued its opinion. The district court concluded that the court of appeals' application of this standard was objectively unreasonable because "there is no way that any

reasonable person would conclude that the trial judge had employed 'scrupulous' exercise of judicial discretion to determine that a mistrial was a 'manifest necessity.'"  Opinion p. 24, JA 469.

In making this assessment, the district court substantially confined its scrutiny to the record facts known to Judge Bond when she declared the mistrial.  As evidence that Judge Bond did not act scrupulously, the district court cited the following facts:  (1) she made no effort to ascertain the truth of what was contained in the foreperson's note; (2) she made no effort to determine whether the extra-judicial information had indeed resulted in corruption of a juror; and (3) although she gave the parties opportunity to state their positions, she did not fully explore available alternatives.  *Id.* at 23-24, JA 468-69.

First, the language found in the plurality *Jorn* opinion is not a Supreme Court "holding" that reflects clearly established federal law.  The term "scrupulous exercise of judicial discretion" does appear in the *Jorn* opinion, but it is not integral to the holding.  The *Jorn holding* can only be ascertained in light of the facts of the case.   In *Jorn*, the trial judge had refused to allow taxpayer witnesses to testify for the government because he did not believe the prosecuting attorney's assurances that they had been given adequate warnings of their constitutional rights.  The judge then precipitously, without warning or consultation with counsel for the parties, discharged the jury. "[I]ndeed, the trial judge acted so abruptly in discharging the jury that, had the prosecutor been disposed to suggest a continuance, or the defendant to object to the discharge of the jury, there would have been no opportunity to do so."  *Jorn*, 400 U.S. at 487.  The plurality opinion goes on to state the court's holding:  "When one examines the circumstances surrounding the discharge of this jury, it seems abundantly apparent that the trial judge made *no effort* to exercise a *sound discretion* to assure that, taking all the circumstances into account, there was a manifest necessity for the sua sponte declaration of this mistrial."  *Id.* (emphasis added).

Hence, the "scrupulous exercise of judicial discretion" language is actually dictum in *Jorn*, i.e., a remark not essential to the *Jorn* holding.  In *Jorn*, reprosecution was barred not because the trial judge failed to act "scrupulously," but because he "made *no effort* to exercise *sound discretion*." Thus, the "scrupulous exercise of judicial discretion"standard is not reflective of *Jorn*'s holding and is not reflective of clearly established federal law.  That the "scrupulous exercise of judicial discretion" standard is not part of the clearly established federal law is confirmed by the fact that the term makes no appearance in *Arizona v. Washington*, which represents not only a more recent, but also a more thorough, treatment of the governing standards.

Moreover, the Ohio Court of Appeals' ruling is not contrary to or an unreasonable application of federal law as prescribed in *Jorn* because Judge Bond's declaration of mistrial cannot be said to have been marked by no effort to exercise sound discretion.  Unlike the trial judge in *Jorn*, Judge Bond did not act abruptly, but gave the parties opportunity to consider the ramifications of the foreperson's note; gave the parties opportunity to state their positions and proposals on the record; invited them to request her to conduct *voir dire* examination of the jurors; and explicitly considered and rejected at least some alternatives to declaration of a mistrial.  Yes, there was room for improvement in Judge Bond's handling of the matter. The point here is simply to recognize that the facts of this case are clearly distinguishable from those presented in *Jorn*, which necessarily define the scope of its "holding."  The *Jorn* opinion thus does not represent a sound foundation for the district court's assessment of the Ohio Court of Appeals' decision under controlling federal law.

### C. Ohio Court of Appeals' Ruling

#### 1. Petitioner's Objections

Petitioner maintains that the Ohio Court of Appeals' ruling is flawed. The specific question we confront, however, is whether it is contrary to or an unreasonable application of clearly established federal law.

Petitioner contends that the Ohio Court of Appeals subjected Judge Bond's declaration of mistrial to review for mere abuse of discretion and thereby applied the wrong standard of review. Petitioner insists it was not incumbent on him to show that Judge Bond abused her discretion. Rather, he argues, the prosecution should have been made to bear the burden of proving that Judge Bond's declaration of mistrial constituted a "scrupulous exercise of judicial discretion."

Application of the *Jorn* "scrupulous exercise" language as governing standard has been shown to be erroneous. Careful reading of *Washington*, which contains more explicit instruction on the governing standards and represents a superior embodiment of clearly established federal law, reveals that a reviewing court is obliged to satisfy itself, with great deference to the trial judge's assessment of possible juror bias, that the trial judge exercised "sound discretion." The Ohio Court of Appeals was cognizant of its duty to ensure that Judge Bond exercised sound discretion. Citing *Washington*, 434 U.S. at 514-16, the court observed: "To exercise 'sound discretion' in determining that a mistrial is necessary, the trial judge should allow the defense and prosecution to state their positions on the issue, consider their competing interests, and explore some reasonable alternatives before declaring a mistrial." Decision p. 12, JA 354. By explicitly finding that Judge Bond had done these things, *id.* at 13, JA 355, the court of appeals at least implicitly held that she had exercised sound discretion. Hence, petitioner has failed to show that the court of appeals' opinion is based on application of an erroneous standard of review.

Petitioner's contention that the Ohio Court of Appeals failed to hold the prosecution to *its* burden of proving manifest necessity is similarly unavailing. Yes, the prosecution bears the burden of justifying the mistrial declared over the defendant's objection. *Washington*, 434 U.S. at 505. In the present context, however, the burden question is largely a matter of semantics. There is no dispute regarding the facts and circumstances encountered collectively by the court and counsel during jury deliberations. Once the decision was collectively made not to *voir dire* any juror, the factual foundation for Judge Bond's decision to declare a mistrial, sufficient or not, was established. The question Judge Bond and later the court of appeals confronted was one of law and discretion: whether the undisputed facts supported a finding of manifest necessity, such that a mistrial could be declared without prejudice to the state's right to reprosecute. Hence, the fact that the court of appeals did not couch its analysis in terms of whether the prosecution carried its burden is of little significance. The focus is not on the adequacy of the prosecution's performance, but on the requirements of the Double Jeopardy Clause. Further, as *Washington* makes clear, the failure of a lower court to explicitly explain its ruling in terms of the governing standard is not determinative, as long as the record provides sufficient justification for the ruling. 434 U.S. at 516-17.

Petitioner also contends the court of appeals evaluated Judge Bond's actions based on an improperly truncated record. Petitioner insists that consideration of the evidentiary record created by Judge Cirigliano, including evidence regarding the discovery of the completed verdict forms, is essential to assessing the soundness of Judge Bond's exercise of discretion. He contends the court of appeals, by limiting its review of manifest necessity to the facts known to Judge Bond when she declared the mistrial, disregarded Judge Bond's authority to revisit her mistrial ruling. Petitioner argues that under Ohio law, Judge Bond's oral declaration of mistrial, albeit on the record, had not become final and effective at the time the verdict forms were discovered because it had not been memorialized in a journal entry. *See State v. Stewart*, 2002 WL 31886657 at *3 (Ohio Ct. App. 11

Dist., Dec. 27, 2002) ("It is axiomatic that a court speaks only through its journal, and not through oral pronouncements."). Upon discovering the verdict forms, Judge Bond thus retained the power to alter her mistrial ruling. Inasmuch as the verdict forms demonstrated that the extraneous information mentioned in the foreman's note had not resulted in prejudice to him in relation to the most serious charges he was facing, petitioner contends the manifest necessity determination could and should have been revisited, and the Ohio Court of Appeals' conclusion that Judge Bond did not abuse her discretion when she failed to do so was objectively unreasonable.

First of all, the authority of a trial court under Ohio law to reconsider its decision after having discharged the jury in open court is limited—even before the journal entry has been made. It is a determination that must be made "on a case-by-case basis based upon the facts of each particular situation." *Gugliotta v. Morano*, 829 N.E.2d 757, 762 (Ohio Ct. App. 9 Dist., 2005). In *Gugliotta*, the trial court had, after a momentary *ex parte* discussion with the jury, reconsidered its open-court decision to grant a mistrial and discharge the jury. After speaking with the jurors while she was in the process of dismissing them, the trial judge changed her mind, reconvened the jury in the courtroom, and instructed them to resume their deliberations. In response to objection by one of the parties, the trial judge conducted *voir dire* examination of the jurors to confirm that her *ex parte* communications had not resulted in any prejudice. She then allowed them to continue their deliberations until they reached a verdict. After careful review of the record, the Ohio Court of Appeals held that, despite the lack of demonstrable prejudice resulting from the interim *ex parte* contact, the potential for prejudice was too great. *Id.* at 764. The court upheld the finality of the original oral decision to discharge the jury so as to avoid setting the stage for "limitless inquests regarding the trial court's discharge, or failure to discharge, a jury." *Id.* The trial court was held to have abused its discretion when it reconvened the jury.

In *Stewart*, too, the trial court reconvened a jury a few minutes after having declared a mistrial and discharged the jury. 2002 WL 31886657 at *2. The trial court had mistakenly believed the jury was deadlocked in its deliberations on all pending charges. It reconvened the jury upon discovering signed ballots in the jury room. The jury was reconvened, however, not for the purpose of resuming deliberations, but solely for the purpose of confirming that the jurors had not been deadlocked in their deliberations on all charges, but had in fact reached a unanimous verdict on three of the four charges, finding the defendant guilty of two charges. Upon polling the jurors, the court accepted the verdicts that had been agreed upon and declared a mistrial on the outstanding charge. The court of appeals upheld the judgment, holding that the oral order declaring a mistrial and discharging the jury was not final when reconsidered because it had not been journalized. *Id.* at *3.

The unpublished opinion in *Stewart* may be reconcilable with the more recent published opinion in *Gugliotta* on the basis of its materially distinguishable facts. At the very least, however, *Gugliotta* teaches that a trial court's authority to reconsider an order discharging the jury is narrowly circumscribed and must be justified by the particular facts presented. Careful scrutiny of the instant facts, to the extent they are developed in the record, reveals that they more closely resemble those presented in *Gugliotta* than those presented in *Stewart*.

The verdict forms represented a surprising development—the sort of surprise Judge Bond had attempted to prevent by proposing *voir dire* examination of the jurors when the foreperson's note was first delivered to her. Yet, both parties had steadfastly objected to the proposal, preferring to take their chances with Judge Bond's ruling on the question of mistrial. It was certainly foreseeable that, once the status of the jurors' deliberations came to light, one party or the other would come to regret the earlier failure to *voir dire* the jurors. Yet, both were willing to assume this risk.

It is undisputed that the verdict forms played no role in Judge Bond's decision to declare a mistrial. In her opinion, the verdict forms, discovered during *ex parte* communications between

herself and the jurors, after the mistrial had been declared and the jurors were officially discharged, but before they were actually dismissed, simply came to light too late to make a difference. Hrg. tr. pp. 156-58, JA 262-64. Consistent with the "well established" teaching of *Gugliotta*, 829 N.E.2d at 762, Judge Bond believed that the jury could not be reassembled at that point because the jury had already been discharged and the case had been adjourned. Hrg. tr. p. 108, JA 214.

Moreover, the mere fact of the intervening *ex parte* communications, creating at least a substantial "potential for prejudice," all but foreclosed the possibility of reconvening the jury. *Gugliotta*, 829 N.E.2d at 764.[4] The record does not disclose the details of the *ex parte* discussions. We know that the jurors were "extremely upset" on receiving the news that a mistrial had been declared and that Judge Bond tried to "accommodate the emotion in the room." Hrg. tr. pp. 61, 104, JA 163, 210. Judge Bond did not make inquiry as to the source of the extraneous polygraph information in the jury room. *Id*. 126, JA 232. Judge Bond told one concerned juror that there was additional evidence that had not been introduced and that defendant Ross would be re-tried. *Id*. at 65, JA 167. Though the complete details of the communications remain undisclosed, these facts, of which Judge Bond was necessarily aware, substantiate the "potential for prejudice" much more strongly than the circumstances which, in *Gugliotta*, were held to foreclose reconvening the jury after it had been discharged.

Judge Bond also believed the partial verdict ostensibly reached by the jury before their deliberations were interrupted, whether guilty or not guilty, could not be accepted because any verdict was irreversibly tainted by juror corruption. Hrg. tr. at 108, 134, JA 214, 240. Indeed, the verdict forms discovered in this case stood on quite a different footing than those discovered in *Stewart*, where the jury had been prematurely discharged on the trial judge's mistaken understanding that it was deadlocked on all charges. In *Stewart*, it was a simple matter to confirm that the ballots discovered in the jury room accurately reflected the final and unanimous decision of the jury on three of the four pending charges and to accept them as the jury's verdict. In *Stewart*, there was no concern about the jury's impartiality having been tainted by extraneous information or by intervening *ex parte* communications with the trial court or its staff.

Here, in contrast, the mistrial was declared and the jury discharged because a note from the foreperson indicated jurors' concerns about juror corruption—corruption that arguably resulted in prejudice to both parties and undeniably impugned the integrity of the jury's deliberations. In fact, it appears to have been the very unanimity of the tentative verdicts, being inconsistent with the tenor of the jurors' deliberations, that precipitated the jurors' concerns in the first place—during the pendency of ongoing deliberations. The extent of the prejudice remained uncertain because the parties adamantly objected to *voir dire* of the jurors and Judge Bond elected not to overrule the objection and conduct *voir dire sua sponte*. When the verdict forms were discovered, they helped define the extent of the prejudice emanating from the juror corruption and suggested that, at least in relation to three of five charges still pending against petitioner, the extraneous polygraph information had not resulted in prejudice to him. The extent to which the juror corruption had resulted, however, in prejudice to the prosecution's interest and the public's interest in a fair trial remained indeterminate. Judge Bond *arguably* could have made inquiry of the jurors to answer this question, but in doing so, would have run afoul of *Gugliotta*'s proscription against "limitless inquests regarding a trial court's discharge, or failure to discharge, a jury." 829 N.E.2d at 764. Further, it is practically inconceivable that the taints stemming from both the juror corruption and the *ex parte* communications could have been cured in such a way as to render the tentative verdict forms acceptable as reflective of the jury's final verdict.

---

[4]*See also Watkins v. Cleveland Clinic Found.*, 719 N.E.2d 1052, 1063 n.7 (Ohio Ct. App. 8 Dist., 1998) ("*Ex parte* communications to the jury by the trial court are anathema and should not be countenanced except in times of extraordinary pressing necessity.").

To be sure, Judge Bond's handling of the discovery of the signed verdict forms—releasing the jurors before advising counsel of the discovery and giving them opportunity to comment on their significance—was far from commendable. Yet, when the existence of the verdict forms was made known to counsel, neither party asked Judge Bond to reconsider the mistrial ruling or for any other relief. *Id*. at 149, JA 255. Hence, whether the late-discovered verdict forms could have been legitimately used to justify Judge Bond's reconsideration of her mistrial ruling is, on the present record, a matter of speculation. What is clear from the above discussion, however, is that petitioner's argument, with reference to Ohio law, that Judge Bond's failure to *sua sponte* reconsider her mistrial was an abuse of discretion is unpersuasive. Instead, it appears likely that if Judge Bond had explicitly reexamined her mistrial ruling in light of the late-discovered verdict forms, she would have been constrained to confirm the ruling.[5]

Even more importantly, it follows that the Ohio Court of Appeals did not err by excluding the verdict forms from its review of Judge Bond's mistrial ruling. An appellate court is hardly at liberty to use the 20/20 vision of hindsight in evaluating whether a mistrial decision represented an exercise of sound discretion, but must, in the exercise of due deference, necessarily confine its review to the facts known to the trial judge when the mistrial was declared. It is undisputed that Judge Bond knew nothing of the verdict forms at the time she declared the mistrial. Even if she had the authority and ought to have explicitly reexamined the decision when she became aware of the verdict forms, it appears she would have been unavoidably constrained under Ohio law to confirm the decision. We therefore find no error in the court of appeals' decision to confine its review of her manifest necessity determination to the facts known to her when she made the ruling. Finally, and most importantly, for purposes of our limited review under AEDPA, the court of appeals' refusal to engage in such speculative analysis has not been shown to be contrary to or an unreasonable application of clearly established federal law, as set forth in any holding of the United States Supreme Court.

### 2. *Merits of Ohio Court of Appeals' Decision*

We turn next to the task of reviewing the merits of the Ohio Court of Appeals' ruling. The court of appeals did not fault Judge Bond for failing to determine whether the contents of the foreperson's note were true, observing that notes received from the jury are typically accepted at face value. The court of appeals characterized the note, advising the court of juror misconduct, as "inherently reliable." The court of appeals further observed that neither party questioned the

---

[5]Petitioner's reliance on *Corey v. District of Vermont, Unit #1*, 917 F.2d 88 (2d Cir. 1990), is similarly misplaced. In *Corey*, a state trial judge had determined that it was necessary to declare a mistrial after the jury was improperly exposed to information prejudicial to the defendant during its deliberations. 917 F.2d at 89. Before the judge could declare a mistrial, however, the jury returned a verdict of not guilty. *Id.* Despite this information, the judge proceeded to declare a mistrial. *Id.* The Second Circuit held that, although manifest necessity may have once existed, a mistrial was no longer necessary once the jury returned a verdict of not guilty, as it was then clear that the defendant had not been deprived of his right to a fair trial. *Id.* at 92.

There are significant differences between the events that transpired here and those that occurred in *Corey*. First, the trial judge in *Corey* had only informed the parties' lawyers of his intent to declare a mistrial when the jury returned a verdict. 917 F.2d at 89. Here, on the other hand, the trial judge had declared a mistrial in open court and had officially adjourned the case and declared that the jury was to be discharged before learning of the jury's tentative, partial verdict. Second, in *Corey*, the misconduct necessitating a mistrial was prejudicial only to the defendant, 917 F.2d at 91, and thus the judge could determine from a "not guilty" verdict that the verdict was not affected by the misconduct. In this case, the jury note indicated prejudice to the interests of both the prosecution and defendant Ross. While the late-discovered tentative not-guilty verdict forms suggested that the extraneous information had not resulted in prejudice to Ross, they did not suggest that the prosecution was not prejudiced. Finally, whereas in *Corey*, the jury had reached a final verdict on all charges and had not yet been formally discharged when the judge learned of its verdict, 917 F.2d at 89, here the jury was in the middle of its deliberations when Judge Bond declared a mistrial and had been officially discharged before she learned of the verdict forms. Given that jurors were "extremely upset" by news of the mistrial and were privy to *ex parte* discussions with Judge Bond, it is extremely doubtful that the jury could have been properly reconvened. At that point, the sanctity of their deliberations had been seriously compromised.

truthfulness of the note and both objected to Judge Bond's proposal to *voir dire* the foreperson or other jurors. In these matters, nothing smacks of an unreasonable application of controlling federal law.

As to Judge Bond's failure to conduct *voir dire* examination of jurors to ascertain whether the extraneous polygraph information had actually influenced their deliberations, the court of appeals again emphasized both parties' express objections to *voir dire*: "To fault the original trial judge, in hindsight, for failing to voir dire the jurors over the objections of both parties is a tactic that this court cannot countenance." Decision p.19, JA 361. In evaluating Judge Bond's exercise of discretion, the court of appeals noted that she clearly considered the option of questioning the jurors, but she deferred to the joint request of the parties that she refrain from doing so. The court of appeals observed: "That the trial judge honored the wishes expressed by the parties and did not voir dire any of the jurors seems to comport with an exercise of sound discretion, not an abuse of it." *Id.* at 20-21, JA 362-63.

Naturally, Judge Bond had the prerogative to conduct *voir dire* examination of the jurors over the parties' objections to ensure a fair trial by an impartial jury. *See United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999) (recognizing trial court's duty to investigate possible juror misconduct). By doing so over the parties' objections, however, Judge Bond would arguably have risked creating a situation where, because of her unilateral intrusion into the sanctity of deliberations, a declaration of mistrial *with prejudice* might have become necessary. In that eventuality, *the court* would potentially have been responsible for defeating "society's interest in giving the prosecution one complete opportunity to convict those who have violated its laws." *Washington*, 434 U.S. at 509. Considering that the note, taken at face value, evidenced corruption of at least one juror due to juror misconduct (not misconduct of the court or either party or their counsel)[6]; and considering that the corruption appeared to potentially prejudice the interests of the defendant, the prosecution and the public; and considering that both parties objected to questioning the jurors, Judge Bond's decision to refrain from questioning the jurors represented the safer and, at least arguably, more prudent course.

The court of appeals' deference to Judge Bond's decision not to *voir dire* the jurors is also consistent with *Washington*'s insistence on appellate deference to the trial judge's evaluation of *possible* juror bias: "[T]he overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." *Id.* at 511. In any event, the court of appeals' ratification of Judge Bond's failure to conduct *voir dire* has not been shown to be an unreasonable application of controlling federal law. In response to petitioner's argument that Judge Bond did not adequately consider all alternatives before finding manifest necessity for mistrial, the court of appeals correctly held that she had no duty to consider every conceivable alternative. That she exercised sound discretion, the court concluded, is evidenced by the fact that she did consider *some* reasonable alternatives before declaring a mistrial. The court of appeals noted that Judge Bond: (1) considered *voir dire* examination of the jurors, but deferred to the parties' wishes; (2) considered the possibility of replacing the problem juror with an alternate, but reasonably rejected this remedy as insufficient to remove the taint; and (3) considered defendant's request to allow the jury to continue deliberating (without prejudice to his right to a

---

[6]Judge Bond identified three aspects of juror misconduct evidenced by the note: (1) the complained-of juror had formed, and expressed to other jurors, an opinion about the defendant's guilt or innocence based on information not introduced in evidence; (2) the juror had refused to deliberate in good faith and had surrendered his own opinion, not because he was persuaded it was wrong, but in order to get the case over with; and (3) the juror had insisted on completing deliberations quickly because he had personal affairs to attend to that precluded his continuing participation in deliberations. Hrg. tr. pp. 109-10, JA 215-16.

mistrial if the jury returned an adverse verdict), but rejected this proposal as unfair to the public's interests.[7]

Again, the court of appeals' analysis in this regard has not been shown to be contrary to or an unreasonable application of controlling federal law. In *Washington*, the Court made it clear that a court need not exhaustively consider all possible alternatives before finding "manifest necessity" for a mistrial. Even where an alternative remedy as simple as a cautionary instruction might have been effective, rendering declaration of a mistrial not "necessary" in the strict, literal sense, the *Washington* Court declined to second-guess the soundness of the trial court's exercise of discretion. 434 U.S. at 511.

The court of appeals' decision is also consistent with *Washington*'s "sliding scale of scrutiny" teaching. Because the mistrial was not precipitated by prosecutorial or judicial misconduct or error, the strictest scrutiny is not appropriate. *See id*. at 508. In fact, this case is akin to a deadlocked jury situation (i.e., where fault is not attributed to any party, counsel or the judge) and is therefore at the opposite end of the scale, warranting the most relaxed scrutiny. Yet, it is evident that the court of appeals did not merely rubber-stamp Judge Bond's decision; it carefully explained why her decision was good enough to pass muster as an exercise of sound discretion.

The predominant thrust of the *Washington* opinion, which is well-illustrated by its holding, is its emphasis on the need for appellate courts to recognize the trial court's prerogative to "exercise broad discretion in deciding whether or not 'manifest necessity' justifies a discharge of the jury." *Id*. at 509. The Court recognized that society's interest in orderly, impartial procedure would be impaired if the trial judge were hindered by a concern that any time a reviewing court disagreed with his assessment, a retrial would automatically be barred. *Id*. at 513. Accordingly, the Court expressly abjured a stringent standard of appellate review in this area, saying that it would seriously impede the trial judge in the performance of his duty to take prompt and affirmative action to protect the integrity of the trial. *Id.* The Court observed that reversal of the trial judge's determination *would* be appropriate if, instead of exercising sound discretion, he acted "irrationally or irresponsibly," citing *Jorn* as an example. *Id*. at 514.

Here, even petitioner has not accused Judge Bond of acting "irrationally or irresponsibly" in the time leading up to her declaration of the mistrial.[8] Under all the circumstances, if the Ohio Court of Appeals had overruled Judge Bond's assessment of manifest necessity (imperfect though it was), the court, in effect, would have applied the sort of stringent standard of review expressly abjured in *Washington*. It necessarily follows that the court of appeals' ruling is not contrary to nor an unreasonable application of controlling federal law, as clearly established in *Washington*, the leading Supreme Court opinion on double jeopardy.

This conclusion is consistent with and further buttressed by the Sixth Circuit's recent decision in *Walls v. Konteh*, 490 F.3d 432 (6th Cir. 2007), applying deferential AEDPA review and reversing a district court's order granting habeas relief on double jeopardy grounds. In *Walls*, the

---

[7] In continuing to quarrel with Judge Bond's rejection of this latter proposal, petitioner continues to ignore the fact that the import of the foreperson's note was at least as unfavorable to the prosecution as it was to his interests. *See* n. 3, *supra*. Because the prejudicial import of the note cut both ways, Judge Bond rightly concluded, as the court of appeals held, that petitioner's putative reservation of the right to a mistrial in the event the verdict was not satisfactory to him was unfair and unreasonable.

[8] Petitioner has attempted to cast doubt upon the soundness of the mistrial declaration by emphasizing Judge Bond's questionable handling of the jurors and discovery of the verdict forms after the mistrial had already been declared. The court of appeals acknowledged that it was hard to ignore this information, but correctly held that "[f]acts unknown to the trial judge and the parties simply cannot enter into the review of the trial court's decision." Decision p. 8, JA 350.

state trial judge declared a mistrial at the start of the second day of a criminal trial, on that infamous day in our nation's history, September 11, 2001.  When airliners began falling out of the sky and crashing into buildings, the jury was excused, the trial was adjourned, and the courthouse was evacuated.  Due to confusion caused by unfolding world events, the trial judge was concerned that jurors would be unable to concentrate and that the parties' right to a fair trial was compromised.  After consulting with counsel, the trial judge declared a mistrial over defendant's objection.  A second trial was commenced two months later and defendant was convicted.  On appeal, the defendant challenged his conviction on double jeopardy grounds.  The Ohio Court of Appeals upheld the conviction and this Court held that the court of appeals' ruling was not contrary to controlling federal law.  Although the trial judge did not deliberately explore all available alternatives, and although the mistrial was not strictly "necessary," the trial judge was deemed to have exercised "sound discretion" because he did not act irrationally or irresponsibly, he was motivated by genuine concern about the possibility of juror bias, and he considered some alternatives to mistrial.  His determination, under unique circumstances, was therefore held to be neither contrary to nor an unreasonable application of any holding of the United States Supreme Court.  *Id*. at 438-39.

Our decision today is entirely consistent with the analysis employed in *Walls*.  The circumstances with which Judge Bond was faced were not quite as unique as those presented in *Walls*, but the likelihood of juror misconduct and corruption was even more clearly established.  Judge Bond's handling of the matter, like the trial court's handling of the circumstances it faced in *Walls*, could have been better.  Yet, as *Washington* makes clear, the *manner* in which the mistrial ruling was made is not determinative.  *See Walls*, 490 F.3d at 438.  As long as "the record provides sufficient justification for the state-court ruling," demonstrating that the court did not act "irrationally or irresponsibly," as did the trial judge in *Jorn*, but exercised "sound discretion," the ruling is not constitutionally defective.  *Washington*, 434 U.S. at 514, 516-17.

It follows that the Ohio Court of Appeals' ruling upholding Judge Bond's declaration of mistrial is consonant with the teaching of *Washington* and has not been shown to contravene or misapply any holding of the Supreme Court.  Accordingly, we conclude, with due regard for the principles of comity, finality and federalism that AEDPA is designed to serve, *see Walls*, 490 F.3d at 439 n.4, that the court of appeals' decision does not represent an unreasonable application of clearly established federal law and that reprosecution of petitioner Denny Ross is not barred by the Double Jeopardy Clause.

### III.  CONCLUSION

For the foregoing reasons, the district court's judgment, granting the petition for writ of habeas corpus, is **REVERSED**.

---

**DISSENT**

---

RALPH B. GUY, JR., Circuit Judge, dissenting. I respectfully dissent because I believe that even if manifest necessity for a mistrial existed at one point, it dissipated once Judge Bond learned of the verdicts. Importantly, Judge Bond's declaration of a mistrial was not final when pronounced orally from the bench. The mistrial was not official until entered in the journal, and the mistrial was not entered into the journal until Thursday, November 2, 2000. *State v. Stewart*, 2002 WL 31886657 at *3 (Ohio Ct. App. Dec. 27, 2002). In *Stewart*, the defendant was charged with kidnaping and aggravated burglary with a firearm specification. After the jury had begun deliberations, they returned to the courtroom and informed the judge that they could not reach a consensus on the firearm specification. The judge mistakenly believed that they could not reach a consensus on any of the charges. She dismissed the jury and orally declared a mistrial. A few minutes later, it was discovered that the jury had signed the verdict forms for three of the charges—guilty as to two, not guilty as to one—but left only the form regarding the firearm specification blank. The jury was immediately called back, the verdicts were read, and the jurors polled. The defendant appealed, arguing, *inter alia*, that the trial court erred by entering the guilty verdicts after a mistrial had been declared. The Ohio court rejected the defendant's challenge to the entry of the guilty verdicts with language equally applicable to this case:

> It is axiomatic that a court speaks only through its journal, and not through oral pronouncements. *Schenley v. Kauth* (1953), 160 Ohio St. 109, 113 N.E.2d 625, paragraph one of the syllabus. The trial court's mistaken oral declaration of a mistrial did not actually result in a mistrial because a mistrial judgment was never journalized. Thus, the trial court was not prevented from realizing that it had misunderstood the communication from the jury, and correcting its erroneous decision to dismiss the jury and declare a mistrial. Appellant's assertion that the trial court erred as a matter of law by accepting the jury's verdict after declaring a mistrial is not well taken.
>
> . . . .
>
> Appellant argues that, because the jurors could change their minds on the verdict between the time they signed the ballots and the time they were polled, they can not be said to have agreed on the verdict until the court has polled them and accepted the verdict. We refuse to follow this restrictive view of what constitutes the jury's agreement on a verdict. The jury, at the time each of the jurors signed the verdict forms, had agreed upon its verdict. The fact that a juror could have changed his or her mind after signing the ballot is immaterial. The jury had agreed on its verdict, was subsequently polled, and each juror confirmed that the judgment represented by the ballots was, in fact, his or her verdict. Thus, we conclude that the court's acceptance of the jury's verdict did not violate R.C. 2945.33.

*Id.* at *3.

In my view, once the trial judge was aware of the verdicts of acquittal, the possibility of juror bias toward Ross was eliminated. Once the possibility of bias against Ross was eliminated, the manifest necessity for the mistrial was also eliminated, at least on the counts for which the jury acquitted Ross. The trial court's error was not in failing to enter the verdicts, but ignoring the existence of the verdicts. A similar situation was presented in *Corey v. District Court of Vermont, Unit #1*, 917 F.2d 88, 89 (2d Cir. 1990), in which the defendant was tried in state court for murder

and aggravated assault. He was accused of shooting the victim from a distance of 92 feet. While the jury was deliberating, one juror knocked on the jury room door and asked the sheriff how far 92 feet was. The sheriff began pacing off 92 feet. The trial judge was notified of what was happening and immediately ordered the jury back to the jury room. After discussing the matter with the attorneys, the judge gave the jury curative instructions. The judge and attorneys then resumed their discussion in the judge's chambers. The judge decided that a mistrial was necessary but that it should be declared in open court. As the judge and attorneys were preparing to return to court, the jury reported that it had reached a verdict. When the defendant asked that the judge not grant the mistrial, the judge stated that he had already declared the mistrial but would have the verdict reported for the record. The verdicts were "not guilty" on each count. The defendant filed a motion for judgment of acquittal, which the trial court denied. He appealed, but the Vermont Supreme Court affirmed. The federal district court denied his habeas petition, but the Second Circuit reversed finding that although manifest necessity may have existed prior to the moment the judge learned of the verdicts, there was no longer manifest necessity after the verdicts were read. The Second Circuit explained: "The trial court no longer has to speculate about the possible impact of misconduct affecting the jury. The trial court can look to the verdict for an answer. The failure to take into account the jury's verdict in this case constitutes an abuse of discretion." 917 F.2d at 92. The possibility that the trial judge had already declared a mistrial orally was of little import:

> [I]t is not enough to state that the trial court had declared a mistrial before the jury notified the court that it had reached a verdict. The jury was permitted to continue in its deliberations, unaware of the proceedings in chambers. When it reached its verdict, the trial judge was given a unique opportunity. An acquittal would reveal the absence of prejudice to the defendant. With no prejudice to the defendant and no articulation of any prejudice by the state to its case, the only remaining basis for a finding of manifest necessity would be the public interest in a trial free of even the perception of an inappropriate influence on the jury. Nevertheless, the limited public interest in having a trial free of *all* possible taint, whether prejudicial or not, by itself cannot overcome Corey's constitutionally protected valued right to have his trial completed by a particular tribunal.

*Id.* at 91 (internal quotation marks and citation omitted).

The state has not alleged any specific prejudice against it other than the public's right to fair trials and the public perception that a juror unwilling to vote his conscience may have gone along with a verdict just to end deliberations sooner. I agree that those concerns are legitimate, but they are not strong enough to override a defendant's protection against being tried twice for the same crimes. The state also stresses that the jury did not reach a verdict on every count for which Ross was charged, including the lesser-included offense of manslaughter. That fact does not change my conclusion that once it was known that verdicts had been reached on the most serious counts, reexamination of the need for a mistrial was required. Finally, the state emphasizes that because the juror's note to the judge was written after the jury reached the three verdicts, it is clear that the jury was still deliberating and could have changed its mind as to the three verdicts. That the jury was still deliberating at the time the mistrial was declared is beyond dispute. But that fact did not foreclose the possibility of, at the very least, questioning the jurors in open court after the verdicts were discovered. It may have been determined, for instance, that the verdicts were still tentative in the jurors minds, or that they were completely finished considering those counts. Once the verdicts were discovered, the trial court should have immediately brought the verdicts to the attorneys' attention and considered all alternatives. Irrespective of the majority's attempt to distinguish *Stewart* and *Corey*, the facts in this case compel me to conclude that the state court's finding that there was manifest necessity constituted an unreasonable application of clearly established federal law.